LIBERTY FINANCIAL MANAGEMENT CORPORATION, Plaintiff-Respondent,

v.

BENEFICIAL DATA PROCESSING CORPORATION, Defendant-Appellant.

No. 44446.

Missouri Court of Appeals, Eastern District, Division One.

March 20, 1984.

Motion for Rehearing or Transfer Denied April 20, 1984.

Application to Transfer Denied June 19, 1984.

David Wells, St. Louis, for defendant-appellant.

Thomas M. Carney, St. Louis, for plaintiff-respondent.

STEPHAN, Judge.

Beneficial Data Processing Corporation (Bencom) appeals from a jury verdict and judgment of the Circuit Court of St. Louis County, awarding Liberty Financial Management Corporation (Liberty) $1,712,-276.00 on Liberty's actions against Bencom for breach of contract and misrepresentation. The judgment is reversed and the cause remanded.

Bencom contends the trial court erred in (1) removing from the jury's consideration the contract's limitation on liability clause; (2) allowing Liberty to seek damages which accrued to other corporations; (3) admitting evidence of the financial condition of Bencom's parent corporation, Beneficial Finance Corporation (Beneficial); (4) receiving into evidence a survey of Liberty's employees; (5) receiving into evidence at the behest of Liberty the affidavit of one of its former officers; (6) allowing Liberty to claim damages for employee time, overhead expenses, executives' salaries, loss of management information, lost profits, and amounts paid by Liberty to Bencom during the first six months of the contract; (7) refusing to declare a mistrial when Liberty's counsel referred to a verdict in another case; and, (8) submitting various instructions.

Liberty is a wholly owned subsidiary of Liberty Loan Corporation (LLC). In addition to Liberty, LLC operated over 100 subsidiaries in approximately 30 states. LLC and its subsidiaries (Liberty Loan corporate network) are in the business of making consumer loans. LLC provides a central managerial function and arranges financing for the lending operations. The subsidiaries, with the exception of Liberty, lend money to consumers through branch offices, with each subsidiary owning one or more branch offices. Liberty operated a personnel office which was responsible for the employment of all persons in the Liberty Loan corporate network and provided the organization with accounting and legal services, statistical analyses, and most importantly for the present case, data processing.

In its role as provider of data processing services, Liberty was obligated to provide both on-line and off-line data processing. On-line data processing refers to a system by which one communicates directly with the computer and obtains immediate responses from the computer, via computer terminals, provided that one's communications are in a format which the computer is programmed to understand. An off-line data processing system exists where data is entered by means of punch cards or computer tapes rather than directly by a computer terminal. In the consumer finance industry, the on-line system is used to transact business with customers and to record the transactions on magnetic tapes. The off-line system uses the magnetic tapes to provide periodic statistical reports.

Liberty, until well after it had contracted with Bencom, provided its own off-line processing, but contracted with another company, Dial Finance Company, for on-line services. In 1976, Liberty became dissatisfied with its then supplier of on-line services and began negotiations with two other vendors, Control Data Corporation and Bencom.

Bencom, like Liberty, is a wholly owned subsidiary of a company which is engaged in the consumer finance business. Bencom supplies data processing services to its parent corporation, Beneficial, and to the rest of the Beneficial corporate network. Unlike Liberty, however, Bencom operates its own on-line data processing and sells its on-line data processing services to other corporations which are referred to as subscribers.

Liberty first negotiated with Control Data Corporation in early 1976. Gerald Holm, president of Bencom, learned that Liberty desired to convert to a different on-line system and asked Colonel Edgar Higgins, then president of Beneficial, to call Stephen Friedrich, president of LLC, to see if Liberty would consider switching to Bencom.

Col. Higgins called Friedrich on March 11, 1976. Col. Higgins told Friedrich that Beneficial had learned that Liberty was considering changing data processing suppliers, that Beneficial wanted to help save Liberty from bankruptcy, and that Bencom had a large organization which was capable of making the conversion by Liberty's July 1, 1976 deadline. Despite some reservations, Friedrich agreed to have Liberty personnel listen to Bencom's presentation.

The next week, Holm and Joe Yankauskas, a Bencom vice president, paid a two day visit to Liberty's headquarters in St. Louis. They had several meetings during which they discussed the possibility of Liberty's conversion to Bencom's system. Liberty personnel who attended one or more of these meetings included: Martin Starr, vice president and treasurer of Liberty; Kenneth Levin, vice president of financial controls; Dan Tobin, director of data processing; and Friedrich.

During the course of persuading Liberty to convert to Bencom, Holm and Yankauskas made various representations as to the capabilities of Bencom and its on-line data processing system. Holm and Yankauskas assured Liberty that Bencom could provide additional services, called enhancements, which Liberty's then current data-processing vendor could not provide. Holm and Yankauskas also told Liberty that because of the size and expertise of Bencom, a

conversion could successfully take place by July 1, 1976.

Liberty decided in mid-April, 1976, to subscribe to Bencom's system. The written agreement between the parties was not signed, however, until May 26, 1976.

Bencom's planning and performance of the conversion were less than adequate. For example, expert testimony indicated that at least nine months should have been dedicated to Liberty's conversion; Bencom devoted less than three months. Furthermore, Bencom's conversion efforts should have been subjected to one or more tests: (1) a test of each computer program; (2) a string test, in which a group of related programs are tested; (3) a systems test, which tests the entire system; (4) a pilot test, in which the user, Liberty here, would be brought in; and (5) a parallel test, in which the existing system and the new system are compared. None of these tests was performed.

By far the biggest error committed by Bencom was the "fourth reel substitution." The conversion from the Dial to the Bencom system required Bencom to copy records of Liberty's accounts which records Dial had kept on six reels of magnetic computer tape. Two sets of the records were provided to Bencom by Liberty, which had obtained the two sets from Dial. Although the two sets contained identical information, it could not be assumed that each reel within a set was identical to the correspondingly numbered reel of the other set. Bencom decided to copy the first set of tapes. When Bencom's computer had trouble reading the fourth reel, Bencom decided to substitute the fourth reel from the second set of tapes without making sure that the two fourth reels were identical. There was evidence that unfortunately the reels were in fact not identical.

Probably as a result of the ill-advised fourth reel substitution, 5000 accounts were missing and 20,000 were duplicated. Although this was the primary problem, there were many others. Among them, the computer system was plagued with much "down-time," i.e., time during which the system was not functioning. In addition, Bencom had obligated itself to provide progress reports, which were daily, weekly and monthly statistical compilations and analyses, to Liberty; however, Bencom's progress reports contained so many errors that they were unreliable and hence useless. Liberty encountered many other difficulties with the Bencom system.

Although many of the problems in the system were eventually corrected, Liberty remained dissatisfied with Bencom's performance and initiated the instant lawsuit. The twelve-week jury trial resulted in the verdict and judgment from which Bencom now appeals.

I.

Bencom's first point contends that the trial court erred in withdrawing from the jury's consideration the contract's limitation of liability clause. We agree.

The contract contains three paragraphs which purport to limit the parties' liabilities:

12. LIABILITY

A. In the event of a willful act directed towards Subscriber [Liberty] individually, or gross negligence by an agent or employee of Bencom of such an unusual or high degree that it would be beyond that which would ordinarily be assumed by Subscriber in providing for itself the services to be performed hereunder Bencom will compensate Subscriber any and all of its out-of-pocket losses but not any loss of business losses and will hold Subscriber harmless from and [sic, any] and all claims of loss by a third party as a result of such willful act or gross negligence.

B. In the event of an error or omission by any agent or employee of Subscriber, Subscriber will hold Bencom harmless from any and all claims of loss by a third party as a result of such error or omission.

C. In any event not covered by 12.A or 12.B. herein above, the costs and ex-

penses of each party shall be borne by the party which incurs them.

The trial court, however, refused to give effect to paragraph 12 and removed it from the jury's consideration by Instruction No. 6:

Paragraph 12 of the Agreement between the parties (including that portion of the letter of June 4, 1976 modifying paragraph 12), introduced in Plaintiff's Exhibit 11, is withdrawn from the case and you are not to consider such paragraph in arriving at your verdict.

The first task is to ascertain the meaning of paragraph twelve. Liberty argues that "[p]roperly construed, paragraph 12A limits consequential damages only in the highly unusual circumstances of willful acts or gross negligence. Except in these situations, Bencom remains fully liable under the contract for all proper damages." Bencom, however, maintains that "... by virtue of paragraph 12A, Bencom would be liable for breach only in the event of a willful act or gross negligence. In all other cases ... each party would bear its own costs and expenses under paragraph 12C."

■ "In construing a contract the words used therein will be given their ordinary and common sense meaning and will not be construed to include meanings to which they would not be applied by most people..." *Grantham v. Rockhurst University*, 563 S.W.2d 147, 150[2–11] (Mo.App. 1978). The ordinary and common sense meaning of paragraph 12C is that in any event not covered by paragraphs 12A or 12B, each party will bear its own costs, regardless of which party was at fault. Thus, under the terms of the contract, Bencom is liable for breach of contract only for willful or grossly negligent acts and then only for "out-of-pocket losses" resulting from the breach, but "not any loss of business losses."

In support of its view that paragraph 12A limits only consequential damages, Liberty focuses upon the use of the word "incurs" in paragraph 12C and argues that it preserves to each party "its normal contract rights and remedies." To support this argument, Liberty cites the *second* definition of the word "incur" found in the Random House Dictionary of the English Language, 722 (Unabridged Ed.1966): "to become liable or subject to through one's own action." From this, Liberty reasons that the costs and expenses of each party, occasioned by the other's breach, are to be borne by the party legally liable to the other. We do not agree. The primary definition accorded to the word "incur" by Webster's Third New International Dictionary, 1146 (unabridged ed. 1981), like the primary definition found in Liberty's source, is: "*vt* 1: to meet or fall in with (as an inconvenience): become liable or subject to: bring down upon oneself (*incurred* large debts to educate his children) (fully deserving the penalty he *incurred*)". Thus, we believe the correct meaning to be accorded to paragraph 12C is that, in any event not made compensable by 12A or B, the party suffering the expense bears it.

The next issue is whether paragraph 12C, which limits Bencom's liability to willful or grossly negligent acts in violation of the contract and excludes liability for merely negligent failures to perform, is void as against public policy. This issue was addressed by our Supreme Court in *Rock Springs Realty, Inc. v. Waid*, 392 S.W.2d 270, 272 (Mo.1965) where it is said, "We shall first dispose of the suggestion sometimes made that an agreement to exempt or exonerate one from the consequences of his own negligence is against public policy. In so far as private individuals and private interests are concerned, that doctrine has been definitely rejected." Citing *Waid*, the Western District of this Court said of a lease provision which released the lessor of a service station from the consequences of its negligence, "Exoneration clauses have been held not to be against public policy in this state." *Phillips v. Atlantic Richfield Company, Inc.*, 605 S.W.2d 139, 141 (Mo. App.1979). The principle was expressed in more detail by Professor Corbin: "It is generally held that those who are not engaged in public service may properly bargain against liability for harm caused by

their ordinary negligence in performance of contractual duty; but such an exemption is always invalid if it applies to harm wilfully inflicted or caused by gross or wanton negligence." 6A Corbin on Contracts, § 1472 (1962).

Here, the exemption in paragraph 12C applies only to acts which are neither willful nor grossly negligent. Thus, the limitation on damages does not violate public policy.

Liberty, however, contends that paragraph 12C, as construed by this court, is invalid because it leaves the parties essentially without remedies for breach of contract and is, therefore, void. As an example, Liberty cites *Wilt v. Waterfield*, 273 S.W.2d 290 (Mo.1954), where the trial court disregarded a sum specified in the contract as liquidated damages and awarded greater damages to the plaintiffs, and the Supreme Court affirmed. The case is distinguishable because in *Wilt* the court held that the damages clause was intended as a penalty to induce performance and was not intended to restrict the amount of actual damages which could be recovered. *Id.*, 296[13]. Here, however, paragraphs 12A and 12C were intended to limit liability and not to provide a penalty so as to induce Bencom's performance.

As indicated above, a party dealing with private interests may properly bargain for its exoneration from the consequences of its ordinary negligence in arriving at the meeting of minds necessary to the formulation of a contract. Moreover, Bencom's efforts to do so in the circumstances present here were perfectly understandable. Liberty's brief stresses the careful planning, programming, and testing necessary to accomplish a successful conversion; and it is obvious from the record amassed during this twelve-week trial that relatively minor errors at any stage in the process could have major consequences. Moreover, Liberty was undoubtedly aware of this fact, as it had been involved in computer data processing long before negotiations with Bencom opened. Liberty could and did agree to the exoneration clause, and Liberty cannot now be heard to say that its agreement was against public policy.

Other arguments advanced by Liberty to void the provisions of paragraph 12 are premised on Liberty's position that Article 2 of the Uniform Commercial Code, particularly § 400.2–719(2), RSMo 1978, is applicable to this contract. The short answer to these arguments is that Article 2 governs "transactions in goods," § 400.2–102, RSMo 1978. This contract is primarily for data processing services which were to facilitate instantaneous input and retrieval by Liberty of information pertaining to its outstanding accounts. The reels of tape and similar tangible items provided to Liberty for daily and monthly reports were incidental to and serendipitous spinoffs of the subject of the contract: Bencom's expertise in the use of computers in the small loan business.

We are guided in this determination by two recent opinions of our Supreme Court, neither of which was available to the trial court when this case was tried. The first of these cases is capsulized in the second, *K & A Litho Process v. Director of Revenue*, 653 S.W.2d 195, 196–197 (Mo. banc 1983), where the following appears:

In *James v. TRES Computer Service, Inc.*, 642 S.W.2d 347 (Mo. banc 1982), the transaction involved a sale of computer software. This was custom-made data and computer programming, transferred to the customer through tapes containing the data. The retail value of the tapes alone was fifty dollars. Once the tapes contained the special information, however, the value was $135,000. The issue in *TRES* was whether there was tax owing based on the $135,000 value. The Commission found that the sale of the data on the tapes was the sale of intangible technical professional services—not tangible personal property—and the use of the information on the tapes was not the use of tangible personal property. In affirming the commission's finding, this Court held that "[t]he data and pro-

grams in this case should not be taxed as tangible personal property.... [T]he tapes themselves were not the ultimate object of the sale. The tapes are merely a medium to convey the data and programs to the customer's computer. After they are used to program the computer, they can be discarded." *James v. TRES Computer,* 642 S.W.2d at 349.

In *K & A Litho,* supra, 196, the "issue for determination" was whether the lithographic process performed by K & A for others resulted in a sale subject to Missouri sales tax. There, the facts were that K & A would receive a color transparency and subject it to the process of lithography, which resulted in a printer's plate. From the plate would come "the finished product, a printed color photograph." Noting that the sales tax is applicable only to the sale of "tangible personal property," the Supreme Court held that K & A's processing of the color transparency and production of the plate was not a taxable event within contemplation of the sales tax law:

> We believe the reasoning of TRES is applicable to the process employed by K & A in the case before us. The film resulting from the color separation of the transparency contains colored dots. The color key is a composite of the separated film. The piece of film serves only to convey the transparency colors and having done so is of no further value. The color separated film and color dye are the result of highly skilled and technical services.

*K & A Litho,* supra, 197.

■ In the instant case, Liberty did not bargain for reels of tape containing computer data, but for Bencom's skill in putting the data on the tapes for transfer to the new Liberty system. This was not a transaction "in goods" as contemplated by Article 2 of the Uniform Commercial Code. Cf. *Computer Servicenters, Inc. v. Beacon Manufacturing Company,* 328 F.Supp. 653, 655 (D.S.C.1970), aff'd., 443 F.2d 906 (4th Cir.1971).

■ Inapplicability of the Uniform Commercial Code does not completely dispose of Liberty's argument that paragraph 12 is void, however, for it relies upon § 400.2–719, RSMo 1978. That section provides in effect that an agreement for the sale of goods may limit the remedies for its breach, unless the limitation would cause the agreement "to fail of its essential purpose." It also permits such an agreement to exclude or limit consequential damages for commercial loss, "unless the limitation or exclusion is unconscionable." From what has been said *supra* concerning the acceptability of exoneration clauses in Missouri, we need not discuss further the issue of whether the immunity from liability for ordinary negligence granted Bencom by paragraph 12 would defeat the purpose of the contract. That exclusion was a bargaining point which Liberty was free to grant or withhold during the negotiations. When Liberty granted it, the "purpose" of the agreement was thus shaped to fit within permissible parameters. The concept of "unconscionability" however, antedates the Uniform Commercial Code and is a well established principle of contract law, deserving further attention.

An early discussion of the concept is found in *Hume v. United States,* 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889). In that case, the plaintiff agreed in writing to sell to the United States certain commodities at stated prices. After receipt of the property, it was discovered that the price quoted in the contract for a particular item had, through clerical error and apparent subsequent oversight by the government, bound the government to pay $1,200 a ton for the items, in spite of the fact that the actual market value was no more than $35 per ton. Holding that the plaintiff was entitled only to the fair market value by reason of the unconscionability of the contract, the court, after reviewing many old English cases, said that an unconscionable contract is one, " 'such as no man in his senses and not under delusion would make, on the one hand, and as no honest and fair man would accept, on the other, ...' " *Id.,* 132 U.S. at 415, 10 S.Ct. at 137, 33 L.Ed. at 397. This definition of an unconscionable

contract has been used by Missouri courts down through the years. See e.g., *Carter v. Boone County Trust Co.*, 338 Mo. 629, 92 S.W.2d 647, 657 (Banc 1935); *Wenninger v. Mitchell*, 139 Mo.App. 420, 122 S.W. 1130, 1132 (1909).

Since the advent of the Uniform Commercial Code and its specific reference to unconscionable contracts, § 400.2–302, RSMo (1978), the issue has been determined by application of the more sophisticated concepts of substantive and procedural unconscionability:

> By substantive unconscionability is meant an undue harshness in the contract terms themselves. On the other hand, procedural unconscionability in general is involved with the contract formation process, and focuses on high pressure exerted on the parties, fine print of the contract, misrepresentation, or unequal bargaining position. Generally there must be both procedural and also substantive unconscionability before a contract or a clause can be voided under Sec. 2–302 ... In the application of these concepts, it has been suggested by one leading writer that there be a balancing between the substantive and procedural aspects, and that if there exists gross procedural unconscionability then not much be needed by way of substantive unconscionability, and that the same "sliding scale" be applied if there be great substantive unconscionability but little procedural unconscionability.

*Funding Systems Leasing Corp. v. King Louie International, Inc.*, 597 S.W.2d 624, 634[6] (Mo.App.1979).

Thus, in discussing a contract for the sale of a refrigeration system, the Western District of this Court held that disclaimers of express and implied warranties, which disclaimers were tucked away in fine print on the back side of the signature page were unconscionable and, therefore, unenforceable under the U.C.C. This holding came after the observation that, "If ever there was an example of the expression 'burying something in fine print,' it is graphically illustrated here." *Oldham's Farm Sausage Co. v. Salco, Inc.*, 633 S.W.2d 177, 181–182 (Mo.App.1982).

Exactly the opposite is true here. Paragraph 12A of the contract was singled out for special attention of the parties. In the "final draft" of the contract, it is crossed out and a hand printed notation appears, "See letter 6–4–76 GLH to MMS for substitute 12, copy attached." In that letter to Martin M. Starr, Vice President and Treasurer of Liberty, from Gerald L. Holm, President of Beneficial, a revised paragraph 12A is set out, and it was made part of the contract upon Liberty's acceptance. Nothing was hidden; there was no surprise. There was no unconscionability, procedural or substantive. The trial court erred in withdrawing Paragraph 12 of the contract from the jury's consideration.

## II.

In its second point, Bencom contends that the trial court erred in permitting the plaintiff in this case, Liberty Financial Management Corporation (otherwise referred to herein as "Liberty") to claim damages for losses incurred by its parent corporation, Liberty Loan Corporation (LLC) as well as the more than one hundred other wholly owned subsidiaries of LLC. Neither the plaintiff nor LLC made any loans directly to consumers. This function was fulfilled by the subsidiaries, which operated the branch loan offices. Thus, all losses arising out of errors in loan accounts were, according to Bencom, suffered not by plaintiff but by the subsidiaries, none of which was a party. Nevertheless, the contractual relationship between plaintiff and its parent corporation was such that plaintiff was bound to provide management and data processing services to the parent and all of the other subsidiaries, for which plaintiff was reimbursed by the subsidiaries and LLC.

At trial, Liberty sought damages for employee time spent on problems caused by Bencom's breach of contract and for profits lost due to the fact that fewer loans were being made because of Bencom's failure to

perform. The damages for employee time would have accrued to the whole Liberty Loan corporate network because Liberty was reimbursed by them. The lost profits would have been suffered solely by Liberty's sister subsidiary corporations because they were the ones who actually made loans.

The issue is thus whether Liberty may recover damages caused by Bencom's breach of contract, which damages were suffered by entities other than Liberty.... "[A] party with whom or in whose name a contract has been made for the benefit of another may sue in his own name in such representative capacity without joining with him the party for whose benefit the action is brought." Rule 52.01.

 In view of the fact that plaintiff was under contract to provide the services to LLC and the other subsidiaries which plaintiff contracted to receive from Bencom, LLC and the other subsidiaries were "creditor beneficiaries" of the Liberty-Bencom contract. "A person is a creditor beneficiary if performance of the promise will satisfy an actual, supposed or asserted duty of the promisee to the beneficiary." *Hardware Center, Inc. v. Parkedge Corporation*, 618 S.W.2d 689, 693 (Mo.App.1981). With such status, LLC and the subsidiaries each could have sued in its own name, but a more expeditious route was followed by having one plaintiff, Liberty, seek vindication of the alleged wrongs in a representative capacity, as allowed by Rule 52.01.

Bencom complains that Liberty should not be allowed to sue on behalf of others because Liberty gave no notice in its petition that it was suing in a representative capacity. Because of our disposition of the present case on other grounds, we need not speculate as to the effect of such omission in the pleadings. We note, however, it is apparent to us from our examination of the transcript in this well tried case that both parties were fully aware at all times what rights were being litigated and who was being claimed to be the victim of the wrongs. Nevertheless, on remand, Liberty will be given leave to amend its petition to include an allegation that it is suing on behalf of the third party beneficiaries. "Judicial concern regarding the real party in interest issue is based upon a policy against splitting a cause of action leading to multiplicity of litigation." *Cantor v. Union Mutual Life Insurance Company*, 547 S.W.2d 220, 225 (Mo.App.1977). This policy will best be served by plaintiff's proceeding in its representative capacity.

### III.

Bencom's third point relied on is that the trial court erred in admitting into evidence Plaintiff's Exhibit 904, the financial statement of Bencom's parent corporation, Beneficial Corporation (Beneficial). On the basis of the evidence at this trial, we find the point to be well taken.

The exhibit is a report addressed to Beneficial's shareholders, dated November 12, 1980, and covers 1979 and the first three quarters of 1980. Gerald L. Holm, who had been president of Bencom during the negotiations with Liberty, was cross examined about the document and testified that it showed the Beneficial shareholders' equity in that corporation to be over a billion dollars. Through answers to interrogatories, Liberty had in its possession from Bencom information that Bencom's total assets in 1976 were 1.2 million dollars in 1976 and 2.1 million dollars in 1977 and that its net profits in 1976 were $220,917 and $382,346 in 1977. Yet, in closing argument, plaintiff's counsel chose to focus on the billion dollar value of the equity of Beneficial's stockholders. With respect to Liberty's prayer for five million dollars in punitive damages, he argued that such measures "are to punish and defer this from happening to other companies. I think with the company with a billion dollars in assets, that five million dollars, it's a lot of money, but everything [is] relative ..." and later in plaintiff's argument: "... I think if you do find for fraud that it should be a substantial sum for punitive damages not only taking into consideration the size of Beneficial, but net assets of over a billion dollars as the largest consum-

er finance company in the country." That no punitive damages were awarded is of no particular consequence; the jury was clearly left with the notion that resources available to pay any verdict for any damages included the billion dollars of the parent, but non-party, corporation. On the record before us at this time, we conclude that the exhibit injected irrelevant matters into the case and should not have been admitted.

In arriving at this conclusion, we start from the principle "that ordinarily two separate corporations are to be regarded as wholly distinct legal entities, even though the stock of one is owned partly or entirely by the other." *Central Cooling & Supply Company v. Director of Revenue*, 648 S.W.2d 546, 548 (Mo.1982). Of course, the existence of a corporate entity may be ignored when it is created or used for an improper purpose. As was said by this court in *Camelot Carpets, Ltd. v. Metro Distributing Company*, 607 S.W.2d 746, 750 (Mo.App.1980), ". . . [T]he question is whether the corporations are being manipulated through their interrelationship to cause illegality, fraud, or injustice. If they are, the corporate veil will be disregarded to provide relief." The mere fact of "ownership and control does not of itself authorize piercing the corporate veil." *C.C. Dillon Co. v. Robinson*, 636 S.W.2d 380, 383 (Mo.App.1982). Here, although the initial contact with Liberty was made by Beneficial's president, Col. Higgins, at the behest of Bencom's president, Mr. Holm, all subsequent contacts and negotiations on Bencom's behalf were directed by its own employees. Moreover, as indicated above, Bencom's capitalization was substantial, and there is a total absence of evidence in this record that Bencom was being used by Beneficial for any malevolent purpose.

Liberty cites two cases which it contends stand for the proposition that the assets of a parent corporation may be shown where the parent corporation's subsidiary is sued for exemplary damages: *Price v. Ford Motor Credit Co.*, 530 S.W.2d 249 (Mo.App. 1975); and *Bower v. Hog Builders, Inc.*, 461 S.W.2d 784 (Mo.1970). Neither case stands for Liberty's proposition.

In *Price*, the court upheld a punitive damage award of $25,000, against Ford Motors Credit Co. The court stated the award was not excessive:

In this case, it cannot be said an award of $25,000, approved by the trial court, was a clear abuse of discretion. There was a finding of conduct meriting a punitive damage award. Defendant's net worth is over 400 million dollars. It has over one million credit accounts. It is a wholly owned subsidiary of one of the nation's largest corporations.

530 S.W.2d at 256[20]. The reference to Ford Motors Credit Company's status as a subsidiary of "one of the nation's largest corporations" must not be taken out of context. The court was addressing only the question of whether $25,000 was excessive as a matter of law. Whether Ford Motor Credit Co.'s affiliation with another company could be paraded in front of the jury was not under consideration by the court.

In *Bower v. Hog Builders, Inc., supra*, the court upheld references to control which the parent could have exercised over the defendant subsidiary through persons not appearing at the trial and to the central office expense which the defendant deducted from its tax return. The court, however, explicitly stated "It was not suggested that anyone other than defendant would be responsible for the judgment..." 461 S.W.2d at 803[17]. Here, however, introduction of Beneficial's financial statement carried a powerful suggestion that Beneficial, not Bencom, would bear the onus of any judgment.

Liberty's final argument in support of the admissibility of Beneficial's annual report is that it was relevant to Liberty's reliance on the size of the Beneficial network of corporations. We do not find this argument persuasive. If, indeed, there was such reliance, it was misplaced; and Liberty made no effort to justify it by requiring a guarantee of Bencom's per-

formance by the parent corporation. Cf. *C.C. Dillon Co. v. Robinson,* supra, 383.

■ While recognizing that, upon retrial, evidence could conceivably be developed which would warrant the use of Beneficial's report, we hold that the document should not have been received in evidence on the basis of the record now before us.

### IV.

Bencom next asserts as error the admission into evidence of the results of a survey taken of persons employed continuously by Liberty throughout the nine months before and the nine months after the conversion to the Bencom system. The purpose of the survey was to determine whether Liberty employees spent more or less time on computer problems after the conversion. The results of the survey showed that computer problems consumed more time after conversion than before. When this additional time was attributed to the various salary levels of the classes of employees, it reflected that the increased, post-conversion costs to Liberty amounted to $462,004.

The exhibit, consisting of 115 questionnaires filled out by persons interviewing persons employed by Liberty during the period mentioned, was presented through the testimony of Mr. Bayard Wynne, director of quantitative techniques practice for, and a principal in, the firm of Arthur Anderson & Company. Among his academic credentials, Mr. Wynne numbered two bachelor's degrees, a master's degree in industrial administration, and a doctorate in management information systems and psychology. He had been a member of the faculty at various universities and had taught courses ranging from psychology to applied mathmatics at the graduate level. He testified to extensive experience in designing and participating in market surveys for clients wishing to examine potential markets for new products or to appraise their products against competition.

He testified in detail how the survey was conducted. Starting with a list of the 875 persons employed by Liberty in March 1977, 606 were selected by use of a "random number table" which is an accepted method of reducing the size of a target group to a number which is still representative of the larger group. From this number were culled 282 employees who met the demographic and experience (four months before and after conversion) criteria initially set by Mr. Wynne. A professional interviewing firm then attempted to reach these persons by telephone and succeeded in contacting 158, who were told that they were being called by the Arthur Anderson Company for a survey in which Liberty was cooperating. Appointments were made with 149 for subsequent in-depth telephone interviews. The interview calls were made from the Arthur Anderson offices by persons trained for such purposes. One hundred forty-five of the interviews were completed, of which 30 were not included in the analysis. The exclusion of the 30 resulted from Mr. Wynne's decision to upgrade the experience criterion from four months before and after conversion to nine months before and after and, also, because of incomplete answers on the part of some respondents. The exclusion resulted, in Mr. Wynne's opinion, in "a qualitative improvement in the data." Of the final 115, there were 59 current employees and 56 former employees. Throughout the entire survey process, care was taken that its results be as unbiased as possible. This was done by wording the questions so as not to suggest answers and by not advising the interviewers of the lawsuit. The results of the interviews were then tabulated and analyzed under Mr. Wynne's supervision, allowing him to arrive at the conclusion that the additional computer problems caused by conversion to the Bencom system cost Liberty $462,004. This opinion was based upon Mr. Wynne's extensive experience in the area of statistics and surveys.

■ Bencom's basic complaint is that the information yielded by the survey is hearsay; and, of course, it is. It does not follow, however, that such characterization automatically mandates exclusion from the consideration of the trier of fact. Because the issue will, in all likelihood, arise on

retrial, we address the question whether the trial court erred in admitting into evidence the results of the survey and the expert opinion drawn from those results. The parties have cited us to no conclusive Missouri authority on the point, and our own research has yielded none. We are persuaded, however, by common sense and reason that it is proper to allow into evidence surveys which meet fundamental requirements of necessity and trustworthiness for the purpose of providing the foundation for an expert opinion such as that elicited here.

As pointed out in 5 Wigmore, Evidence § 1420 (Chadbourn rev. 1974), where the purpose of the rule against hearsay evidence is adequately safeguarded, an exception to the rule may arise. That is to say, cross examination of a declarant, when impossible, may lose its status as a *sine qua non* of admissibility when the trustworthiness of the declaration is otherwise established. Results of properly conducted surveys have gained judicial acceptance, as indicated by *Simon v. Riblet Tramway Co.*, 8 Wash.App. 289, 505 P.2d 1291, 1294 (1973), cert. den. 414 U.S. 975, 94 S.Ct. 289, 38 L.Ed.2d 218, in which one of the issues was whether a year end bonus was a gratuity or part of the plaintiff-engineer's earned wages:

> Defendant also contends the court erred in admitting into evidence an income and salary survey of professional engineers prepared by the National Society of Professional Engineers. We disagree. The survey of engineers' salaries was undoubtedly hearsay. However, the survey was relevant to the issues raised. The data presented therein, being a broad gathering of engineers' salaries, would have been difficult to present by individual testimony. Furthermore, the survey appears trustworthy and reliable, published by a reputable society, and without any apparent reason to falsify it. It has relevancy to one of plaintiff's contentions. Consequently, the survey was admissible.

Perhaps even more instructive is a case in which it was held error to admit the results of a survey. In *Pittsburgh Press Club v. United States*, 579 F.2d 751 (3d Cir.1978), the principal issue was the tax-exempt status, vel non, of the club. To support its position that the social events held at the club were almost exclusively for the recreation of the club members, as opposed to activities of "outside" groups from which the club derived revenue, the club mailed a questionnaire and cover letter to each of its members. The mailing was prepared by a Dr. Kenkel and the club's attorneys. From the responses, Dr. Kenkel determined that the club's outside income for the period in question was only two to four percent of its gross receipts, rather than the eleven to seventeen percent computed by the Internal Revenue Service.

In holding the admission of the survey to be error, the court said, 579 F.2d at 759:

> It was not scientifically designed; indeed, Dr. Kenkel had never before taken a poll. The sample consisting of 281 responses, while large in proportion to the universe of 815 challenged banquets, was not designed to be representative. The respondents, who were all Club members and thus interested in the litigation, were told the precise nature of the litigation and the purpose of the survey. They consequently knew which responses would be helpful to PPC, and conversely, which would be harmful. Moreover, it was possible that a recipient of the questionnaire would fail to respond because he knew an honest response would be harmful to the Club's position. Thus the respondents might have contained a higher percentage of those who could answer in a way helpful to the Club.
>
> It therefore appears that PPC's survey suffers from a severe dearth of any circumstantial guarantees of trustworthiness. Both hearsay dangers—faulty memory and insincerity—loom large in the Club's poll. (Footnote omitted.)

The converse of virtually every proposition set forth in the foregoing as a reason

for excluding the survey in that case could be advanced as a reason for the admissibility of the survey in this case: This survey was scientifically designed by a mathmatician-statistician with extensive experience in poll taking; there was evidence that the number interviewed was representative of the whole group; neither the interviewers nor the interviewees knew the purpose of the poll and had no interest in the outcome.

 Another factor favoring the admissibility of the evidence in this case is that it all came before the jury through the sponsorship of Mr. Wynne, a witness well qualified to express an expert opinion on the ultimate issue of Liberty's loss. Any expert witness represents the distillation of the total of his personal experiences, readings, studies and learning in his field of expertise; and he may rely on such background, hearsay or not, as basis for his opinion. Cf. *Baumholser v. Amax Coal Company*, 630 F.2d 550, 553 (7th Cir.1980).

 In arriving at this conclusion, we recognize that statistically reliable surveys are an accepted tool used regularly in formulating highly sophisticated business decisions. They are an accepted method of determining truth as perceived through the collective judgment of enormous segments of the population. Given the verity that surveys are accorded in everyday life, we see no reason to exclude them from the consideration of the trier of fact in a complex case such as the one at hand. The number of the persons interviewed in the instant case as well as their geographical distribution throughout the United States precluded, as a practical matter, their being called as witnesses. The care and expertise with which the survey was conducted and its results analyzed forcefully militate against any suggestion that the trial court abused its discretion in admitting the survey itself or the expert opinion that was based on it. The methodology employed in taking the survey as well as its statistical reliability were minutely described by Wynne and were targets of cross examination and fair subjects for argument. The

weight accorded to the evidence in question was properly left to jury determination.

If, upon retrial, the survey is presented upon the same foundation and for the same purpose as in the first trial, it may be admitted.

V.

Bencom next complains that the trial court erred in admitting the affidavit of Martin Starr into evidence. The complaint is not well founded.

Martin Starr was vice president and treasurer of Liberty from February of 1976 until February of 1978. During this time he was in charge of Liberty's on-line data processing. Because he supervised on-line data processing, he was Bencom's principal contact with Liberty. Holm and Yankauskas dealt primarily with Starr both in negotiating the contract and in effecting the conversion.

At the time of trial, Starr was no longer employed by Liberty and did not reside in the State of Missouri. His testimony came before the jury via two depositions, one of which was taken in 1978, the other in 1980, and the contested affidavit, which he signed just prior to the filing of the instant lawsuit. The affidavit, Plaintiff's Exhibit 391, covers a wide range of events, from the first negotiations between Bencom and Liberty to the problems experienced by Liberty after the conversion.

The affidavit consisted of out-of-court statements by Starr which were admitted to prove the truth of the matters asserted contained therein. For example, in the affidavit Starr relates that Holm and Yankauskas made various representations concerning the merits of the Bencom system. Had the affidavit not been otherwise qualified, it would have been inadmissible hearsay. See *Gilboe v. Doerflinger Realty Co.*, 614 S.W.2d 4, 7 (Mo.App.1981).

During the 1980 deposition, however, Liberty's counsel asked Starr if all the statements in the affidavit were true. Starr replied in the affirmative. Bencom's

counsel then cross-examined Starr in detail regarding the statements in the affidavit.

The issue is whether a witness' written statement may be admitted where the witness testifies that the averments in the statement are true and subjects himself to cross-examination regarding the truth of such matters. This issue is answered affirmatively by reference to *Jackson v. State*, 476 S.W.2d 598, 600[5] (Mo.1972). In that case, a Rule 27.26 proceeding, a factual issue arose as to "how appellant's counsel handled appellant's case at the preliminary." At the Rule 27.26 hearing, the prosecuting attorney's secretary took the stand and notes which she had taken at the preliminary hearing were received in evidence. In rejecting the argument that the transcribed notes constituted inadmissible hearsay, the Supreme Court noted that the secretary, "... was sworn as a witness; testified in the case with respect to her notes and was available to appellant for cross-examination." Similarly, in the instant case, Starr testified under oath to the truth of the affidavit and was available to Bencom for cross-examination. The affidavit was thus effectively adopted as a substantive in-court statement.

We further note that the affidavit was not read in its entirety to the jury. Before the reading, a conference occurred in chambers during which the trial judge and counsel carefully went through the fourteen page document to allow Bencom's attorney to make specific objections. Liberty's counsel acceded to many of the objections by agreeing to delete the portions objected to; in other instances, the trial court sustained the objections and ordered parts of the statement deleted. No objection to the narrative form of the statement was made in the trial court, and we do not consider it here. We do observe, however, that the "line by line" treatment accorded to the statement in chambers could certainly be argued to have neutralized the vices inherent in such form of testimony.

Although the use of an out-of-court statement in such manner is unusual, we perceive no error in the trial court's admission of the document under the circumstances of this case.

## VI.

Bencom's sixth, seventh, eighth, ninth and tenth points relied on allege trial court error in allowing Liberty to claim various types of damages: wages and salaries of Liberty employees and executives who spent time correcting problems caused by Bencom, overhead allocated by Liberty to the time spent on Bencom-related problems, loss of management information, lost profits, and all amounts paid by Liberty to Bencom during the first six months of the contract. Subject to the contractual provision discussed in Part I, i.e., that Bencom is liable only for breaches of the contract occasioned by its gross negligence or willful acts to the extent of Liberty's "out-of-pocket" losses, we hold that Liberty may recover damages for the wages and salaries, and the money paid to Bencom during the first six months of the contract; however, cost of overhead, loss of profits from loans not made and loss of management information are not recoverable.

In fixing the amount of damages recoverable by Liberty, the goal is to put Liberty in as good a position as it would have been had Bencom carried out the contract. See *Sunny Baer Co., Inc. v. Slaten*, 623 S.W.2d 595, 597[4] (Mo.App. 1981). As part of its compensation, Liberty may recover "the value of the performance of the contract." *Artcraft Cabinet, Inc. v. Watajo, Inc.*, 540 S.W.2d 918, 924[6, 7] (Mo.App.1976). The value of Liberty's performance in this case was the amount it paid Bencom during the six months of the contractual relationship; therefore, Liberty is entitled to a full refund if the jury finds that Bencom's services were worthless. Cf. *Western Outdoor Advertising Co. v. Berbiglia*, 263 S.W.2d 205, 210[4, 5] (Mo. App.1953). If the jury determines Bencom's services had some value, it should reduce any such refund accordingly.

In this connection, Bencom argues that its services were not totally worthless.

It points out such evidence as Liberty's continued use of the Bencom system for the entire six month period and Liberty's account verification which revealed that 99.61% of the accounts were correct and that 99.97% of the information on the accounts was correct. Liberty's president, however, testified that Bencom's reports were essentially worthless. Moreover, the account verification did not occur until January, 1977, more than six months after the conversion. The issue is one upon which the evidence could be marshalled to support either Bencom's or Liberty's position. The issue is thus for the jury and not this court. Therefore, Liberty may seek a complete refund of all sums paid to Bencom during the first six months after the conversion, and the measure of its success, if any, will be governed by the jury's determination of whether Bencom performed, in whole or in part, or not at all.

 In addition to the benefit of the bargain, Liberty is entitled to all damages which are proximate and natural consequences of Bencom's breach and not otherwise excluded by the contract itself. See *Ross v. Holton*, 640 S.W.2d 166, 173 (Mo. App.1982); *Miller v. American Insurance Co.*, 439 S.W.2d 238, 240 (Mo.App.1969). The classic case on the subject of damages for breach of contract is *Hadley v. Baxendale*, 9 Exch. 341 (1854), which was cited with favor by this court in *W.C. Hardesty Co., Inc. v. Schaefer*, 139 S.W.2d 1031, 1035 (Mo.App.1940):

> The rule as laid down in *Hadley v. Baxendale*, 9 Exch. 341, 26 Eng.L. & Eq. 398, to govern the award of damages for breach of contract which has been generally accepted both in England and America is, first, that damages which may fairly and reasonably be considered as naturally arising from a breach of contract, according to the usual course of things, are always recoverable; and, second, that damages which would not arise in the usual course of things from a breach of the contract, but which do arise from circumstances peculiar to the special case, are not recoverable unless the special circumstances are known or have been communicated to the person who breaks the contract.

 To determine whether Liberty may recover the various types of damages which it claims to have suffered and which are not excluded by the contract itself, the first issue is whether Liberty and Bencom could have reasonably contemplated the probability of such losses at the time the contract was entered into. See *Hadley v. Baxendale*, 9 Exch. at 354. Bencom occupied the same position within the Beneficial corporate structure as Liberty did within the Liberty Loan network: both were responsible for delivering data processing services to the affiliated corporations within their own business. Moreover, the Beneficial and Liberty Loan corporations were engaged in the same line of business: making consumer loans. Thus, Bencom and Liberty could have contemplated all damages which in fact resulted from the breach of contract.

 In *Hardesty*, supra, it was recognized that when damages are claimed to have arisen "from circumstances peculiar" to the contract in question, knowledge of such circumstances and the specific damages must be pleaded and proved. *Id.*, 1035. This view comports with that expressed generally in *Parsons Construction Co. v. Missouri Public Service Company*, 425 S.W.2d 166, 173–174 (Mo.1968) and the requirements of Rule 55.19. On remand, Liberty may amend its petition accordingly.

 Liberty thus may seek as "out-of-pocket losses" the amounts paid to its employees for time lost (to Liberty) while its employees sought to correct problems caused by Bencom and while they transacted business manually due to the unavailability of a working data processing system. The term "out-of-pocket" is defined by Webster's Third New International Dictionary, 1603 (unabridged ed. 1981) is defined as, "1: consisting of or requiring an actual cash outlay ..." The evidence adduced at the trial through the opinion survey, discussed above, was adequate to permit the

jury to find that Liberty suffered "an actual cash outlay" in payment of such salaries while its employees attended to problems caused by Bencom's acts or omissions. If, upon retrial, Liberty can persuade the jury that such acts or omissions on Bencom's part are attributable to Bencom's willful violation of the contract or its gross negligence, Liberty may recover such losses. Although the evidence of loss to Liberty through executive salaries was not founded upon the survey but upon the estimates of officers of Liberty, a claim for such damages would be cognizable on the strength of such evidence, subject to the same constraints as all other allowable damages in this case, i.e. that any such loss be attributable to a breach by Bencom arising from its gross negligence or willful act. Cf. *Hargis v. Sample*, 306 S.W.2d 564, 568–569 (Mo.1957).

■ We treat the remaining classifications of damages complained of by Bencom together. These are loss of management information, loss of overhead expenses, and lost profits. Taking these in reverse order, we look first to Liberty's evidence that during the last six months of 1976 it would have made 11,000 more loans than it actually did, but for Bencom's failure of performance. This evidence, presented through expert testimony, was converted by Liberty's expert into a loss of profits of $588,000. To answer this issue, we need only look to the contract itself. Paragraph 12A specifically provides that, although Liberty may recover out-of-pocket expenses under the circumstances set out, Bencom would *not* be liable for "any loss of business losses." Profits are "loss of business losses," and Liberty's evidence on this point should not be received on re-trial.

■ Overhead as a matter of damages is similarly linked to "loss of business." In *Kansas City Bridge Company v. Kansas City Structural Steel Company*, 317 S.W.2d 370, 377 (Mo.1958), the following was said with respect to a similar claim that overhead expense could be attributed to the defendant's delay in performance:

As noted, all of the items with which we are here dealing were fixed and, thus, plaintiff's total overhead was exactly the same whether there had been any delay in the Leavenworth job and exactly the same during the period of delay and exactly the same thereafter. Consequently, even though a percentage of that fixed overhead was properly allocable to the Leavenworth job during the period of delay, nevertheless any amount so allocated could not represent a *loss* or *damage* to plaintiff unless plaintiff would have, but for the delay, obtained other work (which it did not have or which it did not in fact obtain) sufficient in amount to have absorbed the allocated portion of general overhead.

In the instant case, loss of such "other work," as referred to in the foregoing quote, constituted a loss-of-business loss which the parties had ruled out as a compensable item under Paragraph 12A of the contract. Because the contract foreclosed the loss of "other work," e.g. the 11,000 loans not made, as a cognizable item of damages, Liberty could not claim as damages the overhead which would have been allocated to such "other work."

■ Finally with respect to damages, we find merit in Bencom's claim that it was error to permit Liberty's president, Stephen Friedrich, to testify to damages suffered by Liberty as a result of loss of management information which Bencom should have provided but did not. Mr. Friedrich testified that Bencom's failure in this regard caused Liberty to suffer in its "ability to make crisp decisions, timely decisions. . . ." He characterized the impact on Liberty as an "opportunity loss" amounting to damages in the amount of three quarters of a million to a million dollars. We fail to perceive this as a separate item of damages in this case, let alone an "out-of-pocket" loss. To the extent that management had to spend more time making decisions, the damages from loss of management information should be reflected in the damages sought for salaries. To the extent that the loss affected the profitability of Liberty, the damages would be en-

compassed by Liberty's lost profits and not recoverable. The damages for loss of management information, as such, are likewise not recoverable.

### VII.

Bencom next contends that the trial court erred in refusing to grant a mistrial because Liberty's counsel referred to a large judgment in an unrelated case. Bencom's experts had disparaged Liberty's "fully absorbed cost" method of calculating damages, which method includes fixed costs such as overhead. During the cross-examination of Bencom's expert Francis McLaughlin, Liberty's counsel asked whether the expert himself had used the fully absorbed cost method in calculating damages in a totally unrelated case when it suited the interest of McLaughlin's client, MCI, to do so. Then the following exchange took place:

"Q: In that case MCI got a judgment of one hundred point eight billion dollars, isn't that right?

A: No."

The trial court sustained Bencom's objection and instructed the jury to disregard the question and answer. The trial court, however, overruled Bencom's motion for a mistrial.

 Although it would clearly be within the scope of proper cross examination to show that an expert witness changed accounting methods to benefit the economic interests of the party by whom he was retained, the reference to the amount of the verdict in the other case was wholly unwarranted. *Olsten v. Susman*, 391 S.W.2d 331, 334 (Mo.1965). In view of our disposition of this case, it is not necessary for us to determine whether, under all of the circumstances, the trial court erred in denying Bencom's motion for mistrial, but we caution that any such reference should be scrupulously avoided upon retrial.

### VIII.

Bencom's remaining contentions focus on claimed errors in the giving of various instructions. The evidence as adduced upon retrial will govern the instructions to be given at that time. Although we presume that the evidence will be substantially the same upon retrial, that presumption wanes to the point of speculation where, as here, the transcript of trial testimony exceeds 4000 pages. An extended treatment of the points would be nothing more than advisory, as it would necessarily be based on hypothetical fact situations which may or may not be supported by evidence in a future trial. Moreover, we are satisfied that, on retrial, difficulties arising from the various instructions can be anticipated and measures taken to avoid them.

The judgment is reversed and the cause is remanded.

SIMON, P.J., and GAERTNER, J., concur.