STATE of Missouri, Respondent,

v.

Ray Dean ONKEN, Appellant.

No. WD 36198.

Missouri Court of Appeals, Western District.

Oct. 22, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Dec. 3, 1985.

Application to Transfer Denied Jan. 15, 1986.

C.J. Larkin, Columbia, for appellant.

William L. Webster and Mary Elise, Burnett, Jefferson City, for respondent.

Before CLARK, C.J., and KENNEDY and NUGENT, JJ.

KENNEDY, Judge.

Defendant was convicted upon a jury trial of second-degree murder and was sentenced to 35 years' imprisonment. He appeals.

The background facts of the case are set out in *State v. Onken*, 660 S.W.2d 312 (Mo.App.1983), which is our decision in the appeal of defendant's conviction in an earlier trial of the case. We reversed that conviction because of error in the admission in evidence of the results of a test of a bloodstain on defendant's shorts. We held that the evidence did not establish the kind of procedure that was used for the blood analysis, nor that the procedure was established and accepted as reliable in the scientific community. *Frye v. United States*, 293 Fed. 1013, 1014 (D.C.Cir.1923).

I

■ We will take up first whether a submissible case was made. We hold the circumstantial evidence was sufficient to support the submission and the conviction.

The victim, Billie Newcomer, was a 19-month-old girl. She lived with her mother, Cheryl Newcomer, in Green City, Missouri, along with two older children of Cheryl Newcomer. Living in the house also was Ray Dean Onken, the defendant.

Cheryl discovered Billie's body, cold and dead in her bed at 10:30 o'clock on a Sunday morning. There were bruises and lacerations on her body, including one laceration on the jaw which had cut through the muscle to the bone. The orifice of her

vagina was gaping open and the vagina was torn. The immediate cause of her death was later determined to have been a rupture of the heart, which would have required a blow or pressure sufficient to push the sternum almost to the backbone. The body was clothed in the shirt and socks in which she had been put to bed, but the training pants and plastic outer pants which she had worn had been removed.

On the day before the child's death, Cheryl and the defendant, along with Billie and the defendant's son Damien, had visited various points in their car. Damien, six, lived with his mother, formerly the wife of defendant, but was spending the weekend with defendant. During the course of the afternoon defendant had drunk some whiskey. At the defendant's grandparents' home, where they had eaten the evening meal, the defendant had slapped Billie for crying. Later Billie had begun to cry as they were driving. The defendant had stopped the car, had taken the child out and had spanked her.

After they arrived home that evening, Cheryl had put Billie and Damien in their beds in the bedroom and had herself retired. Cheryl's two older children were spending the night with their grandparents. Cheryl was in some misery because of a tooth extraction, and had taken a pain pill before retirement. She had gone to sleep, leaving defendant up and awake.

At about 11:30 on that evening, two acquaintances of Cheryl and of the defendant, Ricky Sayer and Bryan Stroud, had come to the residence. Shortly after their arrival, Ricky and Bryan had gone to a liquor store and had stolen two fifths of whiskey and returned with it. The three of them—defendant and the two guests—had drunk whiskey and had played cards until 3:30 o'clock a.m. when Ricky and Bryan had left the residence.

Cheryl testified to a vague recollection of defendant's coming to bed sometime during the night. She remembered the sound of pants striking the floor, and the weight of a person lying down beside her. She was next awakened at 6 o'clock a.m. by the sound of regurgitation in the bathroom. She went to the bathroom and found the defendant kneeling over the stool, naked except for his socks, vomiting into the stool. She gave the defendant a shove into the floor, and vomited herself. She attempted to get the defendant up and back to bed. She was disgusted with him, she testified, because he was drunk. He became agitated and she poured water on him. At length they both returned to their bed. Cheryl awakened again at 10:30 and it was then that she found Billie's body.

According to the testimony of Rick Sayer, Billie had awakened from her sleep as the three had been playing cards and had begun to cry. The defendant had gone to the bedroom and brought her back to the kitchen where the card game was in progress, and had put her in a high chair. After a time he had asked her if she wanted to go back to bed. He had taken her from the high chair and put her on the floor. She had walked back to the bedroom.

In the few days following the child's death defendant had two or three times said to Cheryl, speaking of Billie's death, according to Cheryl's testimony: "I don't know. I can't remember." When he had been subpoenaed for the coroner's inquest into the child's death, he had said to Cheryl: "I guess we will find out tomorrow whether I did or not." With reference to what he had done after Cheryl had gone to bed on Saturday night he had said to her that he must have been "awful drunk" because he couldn't remember after the first few games of cards. After the inquest he had said to Cheryl: "I very possibly could have, I don't know, I can't remember."

Laboratory tests conducted by the Missouri Highway Patrol laboratory indicated that a bloodstain found on defendant's shorts matched the tiny victim's blood in every point where a comparison could be made, and according to the chemist's testimony the stain could have been made by her blood. One of defendant's head hairs

was found in the vaginal area of the child's body.

There was no evidence of any break-in or violence about the house, except upon the child's body.

On this evidence, the jury returned a verdict of guilty. We find the circumstantial evidence to have been consistent within itself and consistent with a hypothesis of defendant's guilt, and inconsistent with any reasonable theory of his innocence. This makes a submissible case. That the child's death was the result of a criminal act is unquestionable. The defendant had the opportunity to commit the crime. There was nothing to connect any other of the three persons who were in the house that night with the crime. Defendant never unequivocally denied the crime, but acknowledged that he might have done it in his intoxicated state. Scientific evidence of the bloodstain and the hair pointed to defendant as the perpetrator. This was sufficient. *State v. Sneed,* 676 S.W.2d 301 (Mo.App. 1984); *State v. Appelgate,* 668 S.W.2d 624 (Mo.App.1984); *State v. Morris,* 564 S.W.2d 303 (Mo.App.1978); *cf. State v. May,* 689 S.W.2d 732 (Mo.App.1985) (case submissible only if circumstantial evidence excludes every other reasonable hypothesis of innocence).

## II

The admissibility of the evidence of the analysis done upon the stain on defendant's shorts and tending to match the stain with the blood of the tiny victim is once again an issue. The defendant says that the evidence still falls short of establishing the reliability of the test and its acceptance by the scientific community. He says further that the evidence fails to show that the chemist used the correct procedure in conducting the tests, and that the evidence fails also to show that proper safeguards were taken to insure accuracy of the test results.

We hold, however, that the evidence of the test results was admissible, and we reject appellant's argument to the contrary.

The test conducted by the chemist was called the Bloodstain Analysis System. Thomas Grant, whose credentials as an expert were unchallenged, testified that the procedure, designed for comparison of blood samples, is generally accepted as accurate in the field of forensic chemistry. He stated also that the method had yielded accurate results during the years of its use by the Missouri Highway Patrol laboratory where he was employed. Mr. Grant described the procedure, which consisted of various screens of a given stain. First, the presence of hemoglobin in the stain proves that the stain is blood. A second test, a "species origin test", determines whether the blood is human blood. A third test is an "ABO typing" to determine the blood type. And finally, the blood is tested for six enzymes and two proteins. If the hypothetical stain (the stain on appellant's shorts) had matched the victim's blood on all points, the statistical probability of the stain's having been made by the victim's blood was 99,995 to 5, for out of 100,000 people only 5 would have had an exact match to the victim's blood. On the other hand, had there been a mismatch on any point, it would have been conclusive that the stain was not made by the victim's blood.

Mr. Grant testified that the bloodstain tests were "inconclusive" on the ABO typing, inconclusive as to the identification of either of the two proteins, and inconclusive as to one of the enzymes, but matching as to the other five enzymes. In other words, the blood matched on five of the nine points, and was inconclusive on four of them. On the basis of these results, the witness was able to testify that the stain could have been made by the blood of the decedent.

He was able to say positively that the blood had not come either from the defendant or from Cheryl, the victim's mother, because the stain on one or more points did not match their blood.

Defendant, as before noted, attacks the evidence of the test results on four grounds. The first ground is that "the accuracy, reliability, and general acceptance by the scientific community" of the

test was not established. The chemist did, however, testify positively and unequivocally that the test was accepted by the scientific community; that to his own knowledge it was used by a number of forensic chemistry laboratories and recognized as reliable; that it was the only test used by the Missouri Highway Patrol laboratory to compare blood samples; and that his own experience had confirmed the accuracy of the test.

We believe this satisfies the requirements set forth in *Frye*, 293 Fed. 1013, and *Onken*, 660 S.W.2d 312, and we hold that evidence of the results was admissible.

■ Defendant advances two other arguments against the admission of Grant's testimony of the test results. He says there was no proof that the established procedures described by the witness were followed in the conduct of these tests, and that the purity of the samples, media and reagents was not shown as a foundation for proof of the results of the test. The record does not bear out defendant's contention with respect to the witness's following the prescribed procedures. After describing the procedure, the witness was directly asked if he had performed each of the tests which he had described and he answered in the affirmative. It may be inferred also, from his description of the manner of securing and preserving the samples, and from the precautions and the precision with which the tests were conducted according to his testimony, that no contamination, equipment malfunction or the like affected the test results. Defendant points to no evidence to the contrary, but simply points to the absence of direct positive evidence that there was no contamination, no equipment malfunction, no omission to follow the test procedures in every particular. We think, however, that the testimony of the chemist was sufficient to justify the admission of the test results. See *State v. Bush*, 595 S.W.2d 386 (Mo. App.1980). Defendant in cross-examination of the chemist raised the importance of the purity of the samples, the importance of following correct procedures and the like, all of which the jury could consider in assessing the reliability of the results.

■ Finally, defendant says the test results ought not to have been admitted in evidence because the chemist did not give "the representativeness and documentation" for his testimony that Billie's particular blood pattern occurred in only .005 percent of the population, while defendant's blood pattern occurred in 1.4 percent of the population. The witness, however, was himself an expert. He could testify as he did without giving the source of his information. Of course, defendant could have challenged the figures on cross-examination or by direct evidence, but did not do so.

There was no error in the admission of the blood test results.

### III

■ Defendant says it was reversible error to admit into evidence a "mug shot" of himself. That this was a police photograph, a "mug shot", is fairly apparent. There is a frontal view of the defendant and also a side view. Showing in the photographs are height markers indicating the height of the subject. Absent from the photographs is any indication when or on what occasion the photographs were taken.

The admission of the photographs into evidence came about as follows: The witness was Bryan Stroud. He was one of defendant's guests who had been playing cards with him on the evening before the child was found dead in her bed. The prosecutor asked Stroud whether the photographs depicted the defendant's "general appearance" on that weekend. Stroud answered that they did. The photographs were thereupon offered and accepted into evidence over defendant's objection.

It is difficult to see what the prosecutor intended to prove by these photographs, and what relevance they had. However, we are unwilling to reverse this conviction on account of their admission. That the photographs in any way prejudiced the defendant is quite unlikely. There is no indication on these pictures that they were taken in connection with prior criminal activity. Had there been any such indication, it would have been grounds for excluding

the photographs or perhaps for reversing the conviction because of their admission. That was the ground for reversal in *State v. Quinn*, 693 S.W.2d 198, 200 (Mo.App. 1985). As to the pictures admitted into evidence in this case, however, there was no such indication, and the jury could very well have supposed that the pictures were taken upon defendant's arrest for the present offense. *State v. Young*, 661 S.W.2d 637, 639 (Mo.App.1983); *State v. Cook*, 637 S.W.2d 110, 111 (Mo.App.1982); *State v. Shive*, 620 S.W.2d 412, 413 (Mo. App.1981).

## IV

▮ Appellant next complains of the trial court's overruling his motion for sanctions against the state. The motion, filed one week before trial and heard the day the trial began, asked that the state be required to furnish a transcript of the testimony at a coroner's inquest held after the little girl's death, or that the witnesses who testified at the inquest not be permitted to testify at the trial. It appears that the testimony at the inquest had not been transcribed. Defendant argues that § 58.350, RSMo 1978, obliged the state to prepare a written transcript of the coroner's inquest, and that the state was required by Rule 25 to furnish a copy of the same to the defendant upon discovery.

We find no error in the court's ruling. The defendant's own testimony at the coroner's inquest had been transcribed and a transcript had been supplied to defendant's attorney. An audio tape of the entire inquest had been furnished to defendant's attorneys, who had not during the three years and more since the coroner's inquest requested that the same be transcribed until the motion for sanctions was filed one week before trial. The tapes themselves were used in the cross-examination of the state's witnesses. It was not, after all, the duty of the prosecuting attorney to have the coroner's inquest proceedings transcribed; that was the duty of the coroner under § 58.350, RSMo 1978.

▮ Defendant in his argument on this point speaks generally of inconsistent statements made by the state's witnesses at the coroner's inquest, particularly those of Cheryl Newcomer, without specifying the statements, and says he was disadvantaged by not having the transcript. However, Cheryl Newcomer was confronted upon cross-examination with various statements she made upon the coroner's inquest which were inconsistent with her trial testimony. She admitted each one of them. Granted, it would have been more convenient for the defendant to have a written transcript of all of the coroner's inquest testimony, but prejudice we do not find.

The judgment is affirmed.

All concur.