STATE of Missouri,
Plaintiff–Respondent,

v.

David E. McFALL,
Defendant–Appellant.

No. 15019.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 30, 1987.

William L. Webster, Atty. Gen., Carrie Francke, Sp. Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Jon Van Arkel, Springfield, for defendant-appellant.

GREENE, Presiding Judge.

David E. McFall was charged with and jury-convicted of the class D felony of leaving the scene of a motor vehicle accident, § 577.060 [1] (Count I), plus the misdemean-

---

1. Unless otherwise indicated, all references to      statutes are to RSMo 1978, V.A.M.S., and all

ors of failure to stop at a stop sign (Count II), and driving a motor vehicle without having a valid operator's license (Counts III and IV). McFall was court-sentenced, after a finding that he was a prior offender, to five years' imprisonment for Count I, and one year imprisonment each for Counts II, III, and IV, with the sentences to run consecutively, plus a fine of $2,500. We affirm.

The sufficiency of the evidence to sustain the convictions is not contested on appeal. A review of the record convinces us that the jury was presented with sufficient evidence from which it could have found beyond a reasonable doubt that McFall was guilty of the four charges against him. Viewing the evidence in the light most favorable to uphold the convictions, a brief summary of the facts is as follows.

On August 5, 1985, at approximately 9:00 p.m., McFall was seen driving a 1979 Mercury Cougar automobile west on Mount Vernon Street in Springfield, Missouri. The automobile, traveling at a high rate of speed, failed to obey a stop sign at the intersection of Mount Vernon Street and West Bypass and struck a 1983 Chevrolet Chevette automobile being driven north on the Bypass by Curtis Mulholland. Mulholland was severely injured and his passenger, Edward Beitlich, died as a result of the collision. McFall was also injured in the accident, suffering a head cut which apparently bled profusely, since a considerable quantity of blood was found in the interior of his car. Moments after the accident, McFall was seen fleeing the scene on foot.

John David Bishop, Curtis Mulholland's stepfather, happened to be traveling through the intersection in question shortly after the accident occurred and recognized Curtis' car. Bishop who was acquainted with David McFall, through a brother of McFall's, saw McFall standing near the rear of the wrecked Cougar, and then saw McFall flee on foot. Bishop told the authorities he recognized "Dave" McFall, and also recognized the McFall automobile.

Two eyewitnesses of the collision, Warren Robertson and Earl Wallace, after

viewing a police photographic lineup, identified McFall as the driver of the Mercury Cougar at the time of the accident. A third eyewitness, State Highway Patrolman Billy Chadwick, after viewing the same photographic lineup, identified McFall as the person who fled on foot from the scene.

McFall was apprehended on August 31, 1985, after he was seen driving an automobile that did not have a current license plate visible. It was stipulated at trial that McFall did not have a valid license to operate a motor vehicle on either August 5 or August 31, 1985.

Blood samples taken by police from a shop towel found in the Mercury were compared by John Revell, a forensic serologist employed by the Springfield Police Department, with blood samples taken from McFall's body after he was arrested. Revell testified, over objection, that approximately 5 people out of 10,000 would have the comparative counterparts of the two samples.

McFall's defense was that he was not driving the Mercury Cougar at the time of the accident, but that someone else was. The jury evidently chose not to believe him.

McFall's first claim of error is that a photographic lineup shown to state's witnesses Warren Robertson, Earl Wallace, and Billy Chadwick was impermissibly suggestive, and that their identification of a photograph of McFall, shown to them by the Springfield police a few days after the accident, tainted their in-court identification of him as the driver of the Mercury Cougar.

At the time of the accident, Warren Robertson was driving south on West Bypass and noticed that a Mercury Cougar traveling west at a high rate of speed on Mount Vernon appeared not to be preparing to stop at the intersection stop sign. Robertson saw McFall's Mercury crash into Mulholland's Chevrolet automobile. Robertson stopped his car, "went up to the car that went through the sign," and "talked to the driver to see if he was injured." He observed the person for "a minute, minute

references to rules are to Missouri Rules of Court, V.A.M.R.

and a half." Robertson saw the driver of the Mercury get out of the car, and described him as about 5'10" in height, 160–180 pounds, with a full beard, dark hair, and a head wound. In court, Robertson identified McFall as the person he had seen driving the Mercury Cougar.

Earl Wallace testified that as he was driving south on Bypass 13 on the evening in question, he saw a "silver-grayish" car going west on Mount Vernon at a high rate of speed. Wallace saw the Cougar run through the stop sign and hit "a blue Chevette" which was north bound on the Bypass. Wallace went to a nearby home to call for an ambulance, and came back to the scene. He saw a man who had shoulder length "[s]andy brown hair" get out of the gray car and walk away. In court, he identified McFall as being that man.

Billy Chadwick, a trooper with the Missouri State Highway Patrol, was in the vicinity of the accident scene when the collision occurred. When he heard on the scanner in his vehicle that an accident had occurred at the intersection of Mount Vernon and West Bypass, he drove to that intersection, arriving within 30–45 seconds. Shortly after he parked his patrol car, Chadwick saw "a medium-to-large size man with shoulder length hair and blood running down the right side of his face" run in front of the patrol car. Chadwick later identified a picture of McFall, which was part of a collage of four pictures introduced into evidence as state's exhibit 25, as a picture of the man who had run in front of his patrol car on the night in question.

Robertson, Wallace, and Chadwick testified at a suppression hearing that they were shown the photographic array a short time after the accident and that the police asked them if they could identify any one of the pictures as the man they had seen at the scene on the night of the accident. All three testified that no one suggested or implied that the picture of McFall was a picture of the man who was involved in, and fled the scene of, the accident.

Police Officer Arthur Crist, who had shown exhibit 25 to the three witnesses, said, "They were told that we were investigating the accident itself, and they weren't told anything except that if they could identify anybody in the photographs. They were not told that the alleged suspects were in the photographs."

■ In his point relied on, McFall fails to state what was "impermissibly suggestive" about the photo lineup, thus violating the "wherein and why" requirement of Rule 30.06(d). Therefore, the point was not properly preserved for appellate review. Even if it had been, the point has no merit. In considering out-of-court identifications, a two-step analysis is required. First, the police procedures used are considered to determine if they were impermissibly suggestive. Second, if such procedures were impermissibly suggestive, then the inquiry turns to whether the in-court identification was reliable and could have stood on its own without the benefit of the prior viewing of a lineup. *State v. Toney*, 680 S.W.2d 268, 275 (Mo.App.1984).

■ Here, there is nothing to even remotely suggest that the police procedures used in showing the three witnesses a photographic array of four white males, all of whom had long hair and mustaches and appeared to be approximately the same age, were impermissibly suggestive in any way. In the argument portion of his brief, McFall's counsel states that the witnesses were only shown four photographs, and that fact alone shows impermissive suggestiveness. He cites no authority for this statement.

It has been held that even if a witness is shown only *one* photograph, this alone does not result in impermissive suggestiveness, assuming no improper comment or activity on the part of the officer showing the photograph. *State v. Jones*, 643 S.W.2d 34, 37 (Mo.App.1982). Here, there is no evidence of officer misconduct while showing the witnesses the photographs in question. The photographs, which we have viewed, are of sufficient similarity so that one viewing them is not exposed to any significant factor pointing to the picture of McFall other than that, in the witnesses' minds at least, the photograph of McFall looked like the man they had seen at the

scene of the collision. It was not error for the trial court to permit the identification evidence in question.

McFall next contends the trial court erred in "failing to sever Count IV from Counts I, II, and III in that the offense charged in Count IV was separate, distinct, and removed in time and location from the offenses charged in the other counts."

Count IV of the information was a charge that McFall, on August 31, 1985, was driving a motor vehicle without having a valid operator's license. The other three counts related to the charges that on August 5, 1985, McFall, who did not have a valid operator's license, failed to stop his motor vehicle at an intersection thereby causing a fatal accident. The trial court refused to sever Count IV from the other three counts.

The decision of whether to grant a motion to sever offenses is within the sound discretion of the trial court. *State v. Williamson,* 668 S.W.2d 597, 599 (Mo.App. 1984). McFall's motion for severance recited as reasons for the request that (1) joinder of the offenses would result in his substantial prejudice because the jury would likely consider evidence of guilt on Count IV as evidence of guilt on other counts, (2) he might wish to testify as to one of the counts but not to the others, and (3) the ends of justice would be served by granting the severance because his interest in receiving a fair trial on all counts outweighed the state's interest in a speedy disposition of all charges.

■ The motion does not allege sufficient facts to convict the trial court of error through failure to sustain it. In such cases, it has been held that there was no abuse of discretion in failing to sustain the motion to sever. *State v. Williams,* 603 S.W.2d 562, 568 (Mo.1980); *State v. Williamson,* supra, at 600. Even if McFall had sufficiently alleged prejudice in his motion, the facts do not bear out such charge. At trial, McFall stipulated that he had been driving an automobile on the two dates in question, and did not have a valid operator's license.

There was evidence that when McFall was arrested on August 31, he gave the arresting officer the name of Ricky Hufft. This evidenced a desire on his part to hide his identity from the police, which was consistent with his conduct on the night of the accident when he fled the scene. The testimony of the police officer that McFall had given a fictitious name when stopped on August 31 was not objected to; therefore, any prejudice that McFall may have suffered from such statement was self-induced.

Rule 24.07(b) requires that a party, in his motion to sever, make a particularized showing of substantial prejudice if the offense is not tried separately. McFall did not do so. The point is denied.

In his final point relied on, McFall claims the trial court erred in failing to sustain his objection to the testimony of state's witness John Revell. Revell is a forensic serologist with the Springfield Police Department. A forensic serologist is a chemist who analyzes body fluids such as blood, saliva and semen. Revell has a bachelor of science degree in biochemistry, and attended a blood stain identification seminar at the University of Virginia sponsored by that university. The seminar "was for identification of enzymes in the blood." Revell testified that blood consists of a large number of chemicals and cells, and that proteins and enzymes that are found in the blood "are different in some way in certain people." He identified the method by which those proteins and enzymes are identified. Revell testified that on August 6, 1985, he collected blood samples from several places in and on the Mercury Cougar and subjected them to chemical analysis, and that he did the same with a blood sample drawn from McFall's body after McFall had been taken into custody. In the car's interior, type A blood was found on the arm rest of the driver's door, and on a napkin and shop towel that were laying on the right front floorboard. All of the blood was of human origin. When asked what he could determine from the blood sample obtained from the towel, in addition to it being type A human blood, Revell testified:

A. .... I was able to determine enzyme types and from the shop towel, I was able to determine two protein types from the blood, and I was able, on the shop towel, I was able to determine EsD which is a type of enzyme, Type 2; PGM which is another type of enzyme with the subtype of a one plus; AK which is another enzyme, Type 1; GC, which is protein that's Type 2–1 and Transferrin or TF which is also a protein was Type C. All of these are consistent with the blood types that I got from Mr. McFall from his blood sample.

The following questions, answers, objections, and rulings then occurred:

Q. He had those same proteins and enzymes?

A. Yes.

Q. Or his blood did. Have you studied population percentages with regard to various blood groups and proteins, enzymes and such?

A. Yes, I have.

Q. Can you tell us what percentage of the population from the study you have made where blood would have the same characteristics as that found in those samples from the vehicle?

A. Okay. Using the red shop towel, which was found on the passenger floor, which had the largest bloodstain on it; and I was able to get the most enzyme activity from it.

Q. The more you have, the better you can—

A. Usually, yes.

Q. Okay.

A. Then I was also using statistics that I received from the FBI that a person having the blood type—

MR. VAN ARKEL: Your Honor, I'm going to object to statistics that he got from the FBI.

THE COURT: Sustained.

MR. VAN ARKEL: So that would make any statistical analysis improper.

THE COURT: Well, you can voir dire him on that.

MR. VAN ARKEL: All right.

### VOIR DIRE EXAMINATION
BY MR. VAN ARKEL:

Q. Sir, what statistics are you talking about from the FBI?

A. These were given to me at my training course that I took in Quantico and they were derived at the FBI laboratory in Washington, D.C., from blood samples that they test and they kept the statistical data.

Q. And they were given to you?

A. Yes.

Q. You didn't actually conduct these tests and determine these statistics?

A. No, I did not.

THE COURT: So, you're renewing your objection, are you not?

MR. VAN ARKEL: Yes, sir.

THE COURT: That will be sustained solely as to the statistical—

MR. PHILLIPS: May we approach, Your Honor?

(Counsel for the State and counsel for the Defendant approach the bench for conference as follows):

MR. PHILLIPS: Do I understand that he is precluded from testifying as to what he studied?

THE COURT: Well, you hadn't asked him that yet and thus far there has been a proper objection made as to what I think invades the hearsay rule, and I sustained that objection.

MR. PHILLIPS: Okay.

THE COURT: I think he has already testified sufficiently to qualify as an expert which I don't believe is in dispute here, and I think that you called him in connection with the tests that he has made, and I think he has indicated he found blood Type A there and made some other comparison; but I just don't think that you can introduce some report that the FBI or IRS or anybody else had out.

MR. PHILLIPS: I don't either, Your Honor, but he can testify as to what his knowledge is in the area concerning population standards for each blood type.

THE COURT: Well, we just have to take up one at a time and see what Mr. Van Arkel objects to and what he doesn't.

## PROCEEDINGS RETURN TO OPEN COURT

Q. (By Mr. Phillips) John, have you studied from any sources population percentages of blood groups?

A. Yes, I have.

Q. From where all—what's been the source of your study in each of those?

A. The Federal Bureau of Investigation, the FBI in their course and also—

Q. That was part of the course work?

A. Yes.

Q. And part of the reading?

A. Yes, it was and also the Serological Research Institute in California has a manual and—

Q. You've studied that also?

A. Yes.

Q. Based on your studies then, based on what you—your studies, can you tell what percentage of the population have a particular blood groups? What percentage of the population would have blood Type A and then the enzymes and proteins that might go along with that? Can you get more specific?

A. Yes.

MR. VAN ARKEL: Your Honor, I'm going to object again at this point and my objection is this. He is testifying to what other people have told him or have written down and he has read. If he is testifying to statistical probabilities, then I think that's improper.

THE COURT: Sustained.

MR. PHILLIPS: I don't have any further question.

THE COURT: Cross Examination.

## CROSS EXAMINATION

BY MR. VAN ARKEL:

Q. Now, Mr. Revell, did you actually process the car yourself?

A. Yes.

Q. And does that mean that you scraped off blood from certain areas of the car?

A. Yes.

Q. And did you also take some fingerprints?

A. I believe I assisted in lifting some fingerprints from the car, yes.

Q. All right. And you conducted the blood testing, is that right, in the laboratory?

A. Yes.

Q. Can you say positively that this blood came from David McFall?

A. No.

MR. VAN ARKEL: I have nothing further, Your Honor.

## REDIRECT EXAMINATION

BY MR. PHILLIPS:

Q. Can you say how likely it is?

MR. VAN ARKEL: Your Honor, I object to the statistics if they came from another person.

MR. PHILLIPS: Well, it's wide open now, I'm sorry.

THE COURT: Overruled.

A. Yes, it would have been very unlikely.

Q. Do you know any numbers, rough numbers?

A. Yes.

Q. What are they?

A. I would—the blood on the shop towel, there is approximately .05 percent or approximately five people in 10,000 would have that blood type.

MR. PHILLIPS: Thank you. Nothing further.

THE COURT: Anything else?

RECROSS EXAMINATION

BY MR. VAN ARKEL:

Q. Mr. Revell, again, you're saying that you can't say for certain that blood is David McFall's?

A. That is correct but I can't exclude it as his either based on my tests.

THE COURT: Anything else?

MR. PHILLIPS: No, Your Honor.

MR. VAN ARKEL: No.

On appeal, McFall is contending that the trial court, in allowing Revell to state, over objection, that approximately 5 in 10,000 people would have the blood chemistry makeup found on the shop towel and in McFall's blood sample, committed prejudicial error. His reasoning for this position is that Revell, while an expert forensic serologist, was not an expert in statistics and was prohibited by the hearsay rule from giving an opinion based on statistics he learned at the FBI seminar and from other sources. The trial judge, by his rulings, evidently agreed with McFall's attorney on the issue, but recanted after the attorney sought to take advantage of those rulings by asking a question, the answer to which the prosecutor had no chance to rebut because the trial judge had prevented him from introducing evidence of statistical probability.

We are of the opinion that the trial judge was wrong when he initially excluded the statistical data that Revell obtained during his course of study with the FBI and from manuals published by the Serological Research Institute. What Revell was saying was that his opinion that only 5 people in 10,000 would have the comparative blood groupings he found in the two samples was based not only on his own personal observations, but also on his educational experiences. Revell was not challenged as an expert witness. A witness who is testifying as an expert is entitled to rely on hearsay evidence to support his opinion so long as that evidence is of a type reasonably relied upon by other ex-

perts in that field.[2] It has been held that such evidence need not be independently admissible. *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 553 (7th Cir.1980). See also *Standard Oil Co. of California v. Moore*, 251 F.2d 188, 222 (9th Cir.1957), *cert. denied*, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958).

*Baumholser* is cited with approval in *Liberty Fin. Mgmt. v. Beneficial Data*, 670 S.W.2d 40, 53–55 (Mo.App.1984), where it was held that expert testimony concerning a survey that was done to determine whether Liberty's employees spent more or less time on computer problems after Liberty's conversion to the Bencom (Beneficial Data Processing Corporation) system was admissible in face of an objection that the survey was based on what the employees had told the expert, and was, therefore, hearsay. The appellate court said "of course" it was hearsay, *Id.* at 53, but that common sense and reason made proper the admission into evidence of surveys which meet fundamental requirements of necessity and trustworthiness in providing foundation for expert opinion. *Id.* at 54. Any expert witness represents the distillation of the total of his personal experiences, readings, studies and learning in his field of expertise, and "he may rely on such background, hearsay or not, as basis for his opinion." *Id.* at 55. See also *Siebern v. Missouri–Illinois Tractor & Equip.*, 711 S.W.2d 935 (Mo.App.1986), a products liability case, where it was held that expert testimony regarding independent studies previously made under authority of the U.S. Bureau of Mines involving rollover tests of heavy equipment of different sizes and weights was properly admitted as a basis for expert opinion because they met the fundamental requirements of necessity and trustworthiness. *Id.* at 940.

This case is complicated by the fact that the trial court initially *sustained* the hearsay objection and later reversed its earlier ruling, evidently on the ground that McFall's attorney had opened the door to

---

**2.** The statistical probability evidence used in this case was similar to that used in *State v. Onken*, 701 S.W.2d 518, 522 (Mo.App.1985), which contested use was affirmed by the court of appeals.

the introduction into evidence of Revell's statistical probability testimony by asking Revell, on cross-examination, if it were not true that he could not positively say the blood in the car was that of McFall.

 Even though the trial court may have been wrong in its initial ruling that the testimony was barred because it was hearsay, it later corrected that ruling and admitted the testimony, over the same hearsay objection, on the evident grounds of invited error. Even disregarding our previous comments on why we think the testimony was initially admissible, we believe that the ruling complained of here was justified on the invited error basis. The invited error doctrine is that a party who has introduced evidence pertaining to a particular issue may not object when the opposite party introduces related evidence intended to rebut or explain. 5 Am.Jur.2d *Appeal and Error* §§ 713–717 (1962). This is true even though the evidence introduced to rebut or explain would have been inadmissible in the first instance. *Massman v. Muehlebach*, 231 Mo.App. 72, 95 S.W.2d 808, 814 (1936). See also *State v. Jones*, 532 S.W.2d 772 (Mo.App.1975), where the appellate court held that a defendant is precluded from asserting error on the basis of the state's presentation of evidence on redirect to clarify or explain a matter brought into the case by defendant's own questions during cross-examination. *Id.* at 773.

 Finally, even if for the sake of argument we assume that the statistical probability evidence was inadmissible, it is not alleged that such evidence was prejudicial to McFall, and we fail to see how it could have been. John Bishop informed the authorities that he had seen McFall at the accident scene and had seen him flee; two eyewitnesses identified McFall as the hit and run driver, and a third witness identified him as the man who ran from the scene of the collision. Also, when arrested, McFall had a scar approximately 1″ to 1½″ long on his forehead, consistent with a cut that had been suffered in the collision. This was direct evidence of his involvement in the leaving the scene of an accident

charge and, even without the statistical probability testimony, was sufficient to sustain the convictions.

A defendant claiming error has the burden of showing prejudice. *State v. Latigua*, 652 S.W.2d 177, 178 (Mo.App.1983). McFall has not done so. Only prejudicial error is reversible error where the question of admissibility of evidence is involved. *State v. Williams*, 606 S.W.2d 254, 257 (Mo.App.1980). Even assuming error in the reception of the questioned evidence which we do not, there would have been no prejudice. The point is denied.

Judgment affirmed.

CROW, C.J., and HOLSTEIN, J., concur.