**Kimberly M. TODD (Appellant),**

v.

**Janette LOHMAN, Director of Revenue (Respondent).**

**WD 50552.**

Missouri Court of Appeals, Western District.

Dec. 12, 1995.

Howard L. Lotven, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., James A. Chenault, III, Sp. Asst. Atty. Gen., Mo. Dept. of Revenue, Jefferson City, for respondent.

Before FENNER, C.J., P.J., and ULRICH and SMITH, JJ.

SMITH, Judge.

Kimberly M. Todd appeals an order suspending her driver's license under the administrative suspension and revocation provisions of Chapter 302, RSMo 1994. This appeal concerns the admissibility of test results showing the blood-alcohol concentration in Ms. Todd's blood sample to be above the legal limit. We affirm.

### Background

During the early morning hours of April 17, 1994, Ms. Todd crashed her car into a parked pickup truck. The owner of the truck saw that Ms. Todd was injured and that she appeared drunk. The police and an ambulance were summoned. The police officer who arrived at the scene noted that Ms. Todd displayed indicia of alcohol intoxication and arrested her for driving while intoxicated. The ambulance transported Ms. Todd to the hospital for treatment of her injuries.

At the hospital, Ms. Todd consented to a blood test to determine her blood-alcohol content. At the direction of the arresting officer, a registered nurse drew blood from Ms. Todd. The nurse first applied Betadine, a nonalcoholic antiseptic, to cleanse the skin. The nurse drew the blood with a previously unused, sterile needle. Using a Vacutainer syringe, the nurse collected the blood directly into two tubes. Those collection tubes were sterile, dry, and air-tight. The tubes had inert stoppers that were color-coded with

gray tops.[1] The nurse labeled the tubes and gave them to the arresting officer, who sealed them in an envelope. After transporting the blood sample to the Regional Crime Laboratory, the officer placed it in a refrigerator which he locked.

On April 21, 1994, a forensic chemist removed Ms. Todd's blood sample from the refrigerator for testing. The chemist was authorized to conduct the test by virtue of a Type I permit issued to him by the state department of health. In performing the test, the chemist used a gas chromatograph and flame ionization detector. Before any testing, the chemist calibrated the equipment, ran a test sample, and found the equipment to be calibrated correctly. Ms. Todd's blood sample was the third sample tested after calibration. In preparing for that test, the chemist placed one-half milliliter of Ms. Todd's blood and eight-tenths milliliter of internal standard in a vial, capped the vial, mixed the solution, and loaded the solution onto the instrument. The chemist prepared duplicate samples using Ms. Todd's blood and ran two tests. Both tests revealed that Ms. Todd's blood sample contained .18 grams of ethyl alcohol per 100 milliliters of solution.

*Admissibility of Blood Sample Test Results*

█ In a case involving driving while intoxicated, a chemical test of a person's breath, blood, saliva, or urine is admissible as evidence of blood-alcohol content when it meets foundational requirements set by statute and by regulations of the state department of health. Sections 577.020.3 & .4, 577.026.1, 577.037.1 & .4, RSMo 1994. The State lays a prima facie foundation for introducing blood-alcohol test results by showing that a qualified person tested the blood sample with equipment and according to techniques approved by the state department of health. *See Young v. Director of Revenue,* 835 S.W.2d 332, 334 (Mo.App.1992). The requirements for withdrawing the blood sample appear in § 577.029, RSMo 1994, and

direct that only specified licensed medical personnel shall withdraw the blood, that only a previously unused and sterile needle and a sterile vessel shall be utilized to withdraw the blood, and that a nonalcoholic antiseptic shall be used to cleanse the skin. In 19 CSR 20–30.070, the state department sets out the approved methods for analyzing samples for blood-alcohol content. The methods for collecting and preserving the samples appear in 19 CSR 20–30.070(2):

(2) A sample of blood, urine or saliva shall be collected in a clean, dry container that has an air-tight, inert stopper—

(A) For blood samples, if whole blood or plasma is required, an anticoagulant may be used that is appropriate for the test method being employed; and

(B) Urine specimens shall be refrigerated immediately after collection or a preservative may be used that is appropriate for the test method being employed.

*Point I: Use of Whole Blood, Plasma, or Anticoagulants*

Ms. Todd's two points on appeal challenge the admission of the blood-alcohol test results. In Point I, Ms. Todd asserts that the State failed to strictly comply with 19 CSR 20–30.070(2)(A) by not showing (1) whether whole blood or plasma was tested, (2) whether any anticoagulant was used, and if so, (3) whether the anticoagulant used was appropriate for the test method employed.

█ Contrary to Ms. Todd's argument, 19 CSR 20–30.070(2)(A) imposes no affirmative obligation on the State to show the use of whole blood, plasma, or anticoagulants in testing blood samples. The statutes and regulations express foundational requirements for admitting blood-alcohol test results in clear, direct language. *See State v. Setter,* 763 S.W.2d 228, 231 (Mo.App.1988). Foundational requirements in § 577.029 and in 19 CSR 20–30.070 contain the mandatory word "shall" and the restrictive word "only." For

---

1. The hearing transcript fails to explain the significance of the gray-topped stoppers. According to standardized practice, hospitals color-code the stoppers of blood collection tubes to indicate the additive present. Gray stopper tubes contain both a stabilizer (sodium fluoride) and an anti-coagulant (potassium oxalate). Those tubes are preferred for forensic blood samples and are specifically recommended for tests involving whole blood. **2 RICHARD E. ERWIN, DEFENSE OF DRUNK DRIVING CASES 3d § 1706** (1995).

example, § 577.029 directs that "[i]n withdrawing blood ..., only a previously unused and sterile needle and sterile vessel *shall be utilized.*" Therefore, proof of the use of a sterile needle is a foundational requirement essential for admitting blood-alcohol test results. *Setter,* 763 S.W.2d at 231–32. As an additional example, 19 CSR 20–30.070(2)(B) imposes the mandatory requirement that "[u]rine specimens *shall be refrigerated* immediately after collection." In *State v. Regalado,* 806 S.W.2d 86, 88–89 (Mo. App.1991), the State failed to demonstrate strict compliance with 19 CSR 20–30.070(2)(B) because two hours had elapsed between collection and refrigeration.

■ In contrast, 19 CSR 20–30.070(2)(A) uses the permissive word "may." No language in 19 CSR 20–30.070(2)(A) expressly or inferentially requires or prohibits the use of anticoagulants in blood samples:

> For blood samples, if whole blood or plasma is required, *an anticoagulant may be used* that is appropriate for the test method being employed[.] 19 CSR 20–30.070(2)(A).

Further, the current wording of 19 CSR 20–30.070(2)(A) resulted from an amendment of a proposed version of the same regulation that provided:

> Blood samples shall be collected in a clean, dry container that has an airtight, inert stopper, *and contains either sodium heparin, potassium oxalate or sodium fluoride to serve as an anticoagulant.* 12 MoReg 1258 (1987).

The current wording of 19 CSR 20–30.070(2)(A), which replaced the highlighted portion of the proposed version, uses more general, permissive language with respect to anticoagulants. The language and the amendment of 19 CSR 20–30.070(2)(A) demonstrate that the use of anticoagulants in blood samples is permissive. The dependent clause of 19 CSR 20–30.070(2)(A), *"if whole blood or plasma is required,"* permits the use of anticoagulants in testing either whole blood or plasma.[2] As a result, the State need not make an affirmative showing on the use of whole blood, plasma, or anticoagulants unless those matters are specifically made issues in the case.[3]

■ This case presented no issues regarding the use of whole blood, plasma, or anticoagulants in testing the blood sample. At trial, Ms. Todd's counsel objected to the admission of the blood-alcohol test results for an insufficient foundation on the taking of the blood and on the type of blood taken. Nothing in the objection referred to whole blood, plasma, or anticoagulants. Consequently, those matters were not specifically made issues in the case. In absence of a specific objection, the State's failure to prove compliance with even a foundational requirement does not destroy the sufficiency of its case. *Reed v. Director of Revenue,* 834 S.W.2d 834, 837 (Mo.App.1992). Point I is denied.

### Point II: Equipment Malfunction and Blood Sample Contamination

In Point II, Ms. Todd claims the blood-alcohol test results were inadmissible because the State failed to show that the equipment was tested immediately before the analysis of her blood sample. She also faults the State for not establishing that her blood sample was not contaminated by the two previous samples tested. In support, Ms. Todd emphasizes the forensic chemist's testimony that, on the day of the test, he calibrated the equipment before running any tests and that Ms. Todd's blood was the third sample tested.

■ As we stated earlier, the State meets statutory and regulatory foundational requirements for introducing blood-alcohol test results by showing that a qualified person tested the blood sample with equipment

---

2. *"Whole blood"* is blood from which none of the elements have been removed. *"Plasma"* is the liquid portion of the blood in which the particulate components are suspended. *Plasma* is separated from *whole blood* by centrifuging. **The Sloane–Dorland Annotated Medical–Legal Dictionary 90, 91, 554 (1987).**

3. Similarly, although 19 CSR 20–30.031(3) requires maintenance checks on breath analyzers at thirty-five day intervals, that regulation does not require an affirmative showing that the equipment worked properly on the date of use unless the issue of malfunction is raised. *State v. Litterell,* 800 S.W.2d 7, 10–11 (Mo.App.1990).

and according to techniques approved by the state department of health. Nothing in the pertinent statutes or regulations requires testing the gas chromatograph equipment immediately before each blood sample is analyzed. Here, the forensic chemist who analyzed Ms. Todd's blood sample possessed a Type I permit which authorized him to conduct the test. At trial, the chemist meticulously described each step in using the equipment and in analyzing the blood samples. The chemist performed duplicate tests on Ms. Todd's blood sample, and attained identical results. This evidence sufficiently dispels Ms. Todd's suggestions of equipment malfunction and blood sample contamination. *Cf. State v. Onken*, 701 S.W.2d 518, 522 (Mo. App.1985) (in which a chemist's precise description of testing methods sufficiently established a foundation for admitting results of bloodstain comparisons).

We deny Ms. Todd's Point II, and affirm the order suspending her driver's license.

All concur.