Neil SCHAFFER, Claimant–Appellant,

v.

LITTON INTERCONNECT TECHNOL-
OGY and Insurance Company of the
State of Pennsylvania, Respondents.

No. SD 28995.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 14, 2009.

Randall J. Reichard, Lowther Johnson, Springfield, for Appellant.

William C. Love, Daniel P. Molloy, Hyde, Love & Overby, LLP, Springfield, for Respondents.

JOHN E. PARRISH, Judge.

Neil B. Schaffer (claimant) appeals a final award of the Labor and Industrial Relations Commission (the commission) that denied workers' compensation benefits. This court affirms.

Claimant sought compensation for an alleged occupational disease he asserts began approximately May 2, 2002.[1] He was an employee of Litton Interconnect Technology (Litton) on the alleged injury date. He alleged that "[w]hile in the course of his employment, [he] was required to work excessive numbers of hours a day, specifically 70 to 80 hours a week, and was on call 365 days a year, 24 hours a day, which caused stress resulting in irritation to [his] heart and anxiety and depression."

 The commission affirmed the award of the administrative law judge. It adopted her award and decision and incorporated the award and decision by reference in its Final Award Denying Compensation.

[T]his court reviews the findings and award of the Commission rather than those of the [Administrative Law Judge]. *Birdsong v. Waste Mgmt.*, 147 S.W.3d 132, 137 (Mo.App. S.D.2004). However, when the Commission incorporates the [Administrative Law Judge's] award and decision in its own determination, as in this case, we review the [Administrative Law Judge's] findings and conclusions, as adopted by the Commission.

*Cox v. Collins,* 184 S.W.3d 590, 592 (Mo. App.2006). The commission found that claimant failed to prove, by objective standards and actual events, that he suffered from work-related stress.

Upon review, an appellate court may modify, reverse, remand for rehearing, or set aside the award of the Commission only if it determines that the Commission acted in excess of its powers, the award was procured by fraud, the facts found by the Commission do not support the award, or there was not sufficient competent evidence in the record to warrant making the award. *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222 (Mo.banc 2003). We examine the whole record in order to determine whether there is sufficient competent and substantial evidence to support the award. *Id.* at 223. "[W]e must determine whether the Commission reasonably could have made its findings and reached its result based upon all of the evidence before it." *Fitzwater v. Dept. of Public Safety,* 198 S.W.3d 623, 627 (Mo.App.2006). However, "we defer to the Commission on issues involving the credibility of witnesses and the weight to be given testimony, and we acknowledge that the Commission may decide a case 'upon its disbelief of uncontradicted and unimpeached testimony.'" *Alexander v. D.L. Sitton Motor Lines,* 851 S.W.2d 525, 527 (Mo.banc 1993) (quoting *Ricks v. H.K. Porter, Inc.,* 439 S.W.2d 164 (Mo.1969)).

*Clayton v. Langco Tool & Plastics, Inc.,* 221 S.W.3d 490, 491–92 (Mo.App.2007). Further, a claim for mental injury due to work-related stress requires proof that the injury was, in fact, caused by work-related

1. Claimant also sought recovery from the second injury fund for prior "injury(ies) paroxysmal atrial tachycardia; left atrial enlargement and heightened adrengergic [sic] tone." However, at the start of the hearing before the administrative law judge he dismissed the second injury fund claim.

stress and that such work-related stress was extraordinary and unusual measured by objective standards and actual events. § 287.120.8.[2]

Claimant began working for Litton in 1989 as an environmental engineer. When he was first employed, his duties included monitoring chemical treatment systems; being knowledgeable of various local, state, and federal regulations that governed the use, transportation, and disposal of chemicals; monitoring and submitting reports to various agencies; training and managing employees; and, performance of safety inspections of facilities.[3] Claimant testified that when he began working for Litton, his position required him to work approximately 50 hours per week; that he occasionally took work home, but did not regularly work weekends or holidays.

In 1997, claimant became environmental safety manager. His new position was a promotion. He was assigned additional responsibilities and his pay was increased. The new position was part of Litton's management level. Claimant continued working for Litton in that capacity until October 9, 2002, when he resigned his position with the company and retired.

The position of environmental safety manager was created following claimant's suggestion that the position be established. Claimant's proposal described the duties for the position as follows.

Department will assume all duties associated with safety policies and programs, training and safety engineering. All health issues and insurance are to remain with personnel. Accident investigations still controlled by nurse with

follow-up on all investigations performed by Env. Engineer.

Claimant testified that in addition to the environmental duties he previously performed, he became responsible for maintaining safety policies and procedures, and providing safety training and inspections; that he was a member of Litton's emergency response team. He was also given responsibility for a clean-up site behind the company's main facility.

Claimant's new responsibilities included safety oversight of two additional plants, one in Massachusetts and one in California. His role was a support role. He was not responsible for their day-to-day operation, nor was he required to travel to the other plants. The Massachusetts and the California plants were smaller than the Springfield plant. Claimant held the position that he assumed in 1997 until he stopped working for Litton in 2002.

Claimant testified that he worked over 70 hours per week in the position he assumed in 1997; that he worked during most vacations and weekends. He testified that he had to miss lunch; that his wife began going to the office with him to help him with his typing. He said his supervisor found out that his wife was helping him and told him she could not do that. Claimant said that after that, his wife did the typing at home. Claimant's supervisor, Jim Fox, testified that he did not believe it was necessary for claimant to work the number of hours that he claimed he worked.

Claimant asserts that the injuries for which he seeks compensation were sustained in the course and scope of his employment. Claimant contends his injuries

---

**2.** References to statutes are to RSMo 2000, unless stated otherwise.

**3.** During the time claimant was employed by Litton, the company had two plants in Spring-field, Missouri, one in Andover, Massachusetts, and one in Fairfax, California. It also had clean-up sites in Texas and California.

commenced in May 2002. He testified that he was at his home on May 18, 2002; that he had taken a week's vacation time. He was preparing to weed his yard when he experienced a rapid and irregular heart beat. He was taken to an emergency room where a physician concluded that he had experienced atrial fibrillation.

Claimant had experienced incidents of rapid heart rate prior to the May 18, 2002, incident due to paroxysmal atrial tachycardia (PAT). He had been diagnosed with PAT as a teenager in 1973. His PAT symptoms included increased heart rate and light-headedness. Prior to 1997, claimant's PAT incidents occurred two to five times a year. Each of those occurrences lasted less than a minute. He claimed the symptoms he experienced May 18, 2002, were different from the previous PAT occurrences.

Claimant returned to work periodically after May 18, 2002. He worked two to four hours a day from May 26 to approximately June 20. He worked maximum eight-hour days, 40 hours a week from July 2 to July 22. He worked fewer than 40 hours per week from September 17 to October 7 and limited his work to performing low stress duties. He experienced increased symptoms of anxiety and depression each time he returned to work.

Claimant was on medical leave from June 20 through July 1 and from July 23 through September 16, 2002. On October 7, 2002, he requested his primary care physician, Dr. Lyons, to recommend "another couple of weeks of medical leave." Dr. Lyons recommended permanent retirement. Claimant submitted his resignation and retired October 9, 2002. He filed the claim for permanent total disability on October 30, 2002.

The administrative law judge's conclusions of law, which were adopted by the commission and made part of its Final Award Denying Compensation, state:

The key issue in this case is whether claimant can meet his burden of adducing substantial and competent evidence supporting his claim that the alleged occupational disease is attributable to claimant's employment with [Litton]. Claimant bears the burden of proving that the alleged mental injury was caused by stress that was work-related and that the work-related stress was extraordinary and unusual. *Sherman v. First Financial Planners*, 41 S.W.3d 633, 637 [(Mo.App.2001)]. Further, it is clearly stated in § 287.120.8[,] RSMo[,] that the work-related stress shall be measured by objective standards and actual events. § 287.120.8[,] RSMo. In accordance with this objective standard, a claimant "must compare [his] work-related stress with the stress encountered by employees having similar positions, regardless of employer, with a focus on evidence of the stress encountered by similarly situated employees for the same employer." *Sherman*, 41 S.W.3d at 637 (*quoting Williams v. DePaul Health Center*, 996 S.W.2d 619, 628 (Mo. App.1999)). Therefore, "without presenting evidence of similarly situated employee's [sic], [claimant] is unable to meet the statutory burden set forth in § 287.120.8[,] RSMo." *Sherman*, 41 S.W.3d at 637.

There is no doubt that the claimant found his work to be extremely stressful. He has been diagnosed with a Generalized Anxiety Disorder. The question is not what the claimant subjectively thought and felt, but rather what he can prove by objective standards and actual events.

After carefully considering all of the evidence, I do not find that the claimant has presented sufficient objective evidence to meet his burden of proving the

stress he experienced was extraordinary and unusual. He has not shown that the amount of stress he experienced was greater than that in comparable positions in his field. The only evidence as to similarly situated employees was that he was looking for a less stressful job and was unable to find one. He stated that the hours required in the jobs he applied for was 60–70.

Nor did claimant show that the stress he experienced was greater than that of other employees of the same employer. The claimant must do this not by his subjective testimony but by objective standards and actual events. Although he testified to the number of hours he was required to work; [sic] there were no objective records to confirm his testimony.

Furthermore, the things he stated caused him stress were all things that other employees in the management level at Litton were required to do. Other managers at Litton experienced similar increases in work load with the plans for the facility replacement. The wage and salary freeze as well as the hiring freeze affected all the managers, and they were required to adjust to the economic downturn. Other management level employees also had very stressful duties that required them to work overtime, be on call, be responsible for issues in other plants, participate on the emergency response team, and take work home. Therefore, while he had an extremely stressful job, I do not find that he has proven that it was objectively, and by actual events, more stressful that [sic] other employees at Litton.

I find that claimant has failed to satisfy his burden of proving a work-related stress claim by objective standard and

actual events. Therefore, his claim is denied.

Claimant's first point on appeal contends the commission erred in denying compensation. Claimant argues that the "decision is not supported by competent and substantial evidence upon the whole record and the facts found by the Commission do not support the award because competent evidence demonstrated that Claimant's anxiety was clearly work related and was extraordinary and unusual in that Claimant worked 70–90 hours per week, worked at home in the evenings, on weekends, during vacations and plant shut-downs"; that claimant "had inadequate staff support, he had multi-site responsibility in several states, and endured the death of a co-worker and subsequent lawsuit and harassment by his family, all of which exceeded the level of stress of other employees having similar positions."

■ As the commission observed, § 287.120.8 establishes what must be shown to demonstrate that mental injury resulted from work-related stress arising out of and in the course of employment. It states:

> Mental injury resulting from work-related stress does not arise out of and in the course of the employment, unless it is demonstrated that the stress is work related and was extraordinary and unusual. The amount of work stress shall be measured by objective standards and actual events.

In *Williams v. DePaul Health Center*, 996 S.W.2d 619 (Mo.App.1999), the Eastern District of this court explained:

> [T]he proper comparison for purposes of Section 287.120.8[, RSMo 1996,][ [4] ] is to compare Employee's work-related stress with the stress encountered by employees having similar positions, regardless

---

4. § 287.120.8, RSMo 2000, is unchanged from the 1996 revision of that statute.

of employer, with a focus on evidence of the stress encountered by similarly situated employees for the same employer. See Dunlavey [v. Economy Fire and Casualty Co., 526 N.W.2d 845 (Iowa 1995).]

Id. at 628.

■ Claimant's position with Litton as environmental safety manager was specialized and unique. The position was created and structured pursuant to claimant's request. It was a management position. All of Litton's management level personnel were required to be "on call" twenty-four hours a day, seven days a week. There was evidence that, from time to time, claimant requested additional help; that when Litton could do so, it provided additional help and instructed claimant to delegate some of his duties. There was no evidence that claimant's duties were greater than those of other management personnel at Litton or that Litton's actions in establishing and providing for the position claimant occupied in its company were not in good faith.

Claimant attempted to find less stressful employment in his field from 1997 through 2001, but was unable to do so. The only job offer he received during the course of those efforts was from a wastewater development project in Saudi Arabia. Further, although claimant asserted that he worked substantially more than 40 hours per week, Litton's records indicate that he worked 40–hour weeks; that during the relevant time period, he took 17 weeks of vacation.

There was evidence that claimant had many stressors outside his employment. He experienced stress from various family and personal problems, including illnesses, his father's death, and damage to property he owned. There was expert medical testimony that supported the commission's finding that claimant's disorder and symptoms were not caused by his employment.

Claimant relied on testimony of a series of doctors that he had consulted to support his claim that he had sustained mental injury from work-related stress that arose out of and in the course of his employment. He also relied on testimony of Phillip Eldred, a certified rehabilitation counselor, who concluded that claimant had vocational restrictions to the extent that he was unemployable in full-time, gainful employment.

Claimant's personal physician, Dr. Lyons, treated claimant shortly after claimant's May 18, 2002, visit to an emergency room. He diagnosed claimant with PAT. He performed an echocardiogram. Its results were normal. Dr. Lyons ordered an exercise stress test with wall motion analysis and ejection fraction calculations. The test results were normal. Dr. Lyons' opinion at that time was that claimant's medical issues did not preclude him from continuing to work; however, Dr. Lyons placed limitations and restrictions on claimant's work activities "until the cause of his symptoms [were] better elucidated."

In June 2002, claimant reported to Dr. Lyons that since March or April of 2002 he had experienced difficult circumstances; that several family members had been hospitalized; he was working 70–80 hours per week; sleeping very little; that he had little time with his wife. Claimant reported that he had been in an emergency room earlier that week for chest pain. An EKG and rhythm strips were performed during the visit. The test results were normal. Dr. Lyons referred claimant to Dr. Bright, a psychiatrist. Dr. Bright diagnosed claimant with generalized anxiety disorder, major depressive disorder, single episode without psychosis. He increased claimant's medication.

Claimant was dissatisfied with Dr. Bright. He requested that Dr. Lyons refer him to another psychiatrist. Dr. Lyons referred claimant to Dr. Bolyard. Claimant asserted that his symptoms were related to "conversations that [gave him] adrenaline rushes" and to "anything that has to do with ... work." Dr. Bolyard explained his view of claimant's situation:

[Claimant] is a quite verbal, highly intelligent man who finds himself in a situation which he perceives as intolerable. He does provide an internally consistent story that may in fact be an actual description of a job that truly is excessive and intolerable. However, it is also true that [claimant] tends to view problems in black-and-white terms. While it is unreasonable to expect that any person could tolerate the stresses and demands of the job he describes, it is just as unreasonable to expect a 50–year–old man to spend the rest of his life fishing every day. He has no insight into the fact that his own judgment and decisions have played any sort of role in his current predicament. At this time, I believe the intent of his medications is effective. Minor adjustments will be made below. However, I believe it is critical for him to engage in insight-oriented psychotherapy, as his expectations are unreasonable and it did not appear that he is able to view accurately any responsibility he has for the decisions that have placed him in this unreasonable employment.

Claimant began treatment with a clinical psychologist, Dr. Darrow, who treated claimant's anxiety from what she characterized as a cognitive behavioral standpoint. She discussed with claimant how thought processes influence behavior. She worked on ways for claimant to "self-calm" using relaxation techniques and removing triggering stimuli. Dr. Darrow believed claimant's condition was directly caused by his employment with Litton. Her opinion was based on a history of claimant's work and symptoms obtained solely from claimant.

In 2004 Dr. Lyons provided claimant with a letter that stated claimant's symptoms were primarily anxiety related to, and a direct result of, stress experienced while working for Litton. At claimant's request, Dr. Lyons revised the letter to include a prognosis. Claimant suggested that this include that he was permanently and totally disabled. The letter was revised. The revised letter expressed Dr. Lyons' opinion that claimant suffered severe, chronic, and disabling anxiety as a direct result of his employment; that claimant was totally and permanently disabled. A June 5, 2006, letter from Dr. Lyons stated that claimant's prognosis would "be reasonably good once [the litigation] issues [were] settled and he remain[ed] in isolation from outside stressors." Dr. Lyons stated his opinion that claimant's employment with Litton directly caused claimant's symptoms; that it played a substantial contributory role in his diagnosis. Dr. Lyons did not believe claimant would be able to return to work at Litton, although he believed claimant could work at a much lower stress job and could proceed from there.

Prior to the hearing before the administrative law judge, claimant was seen by a psychiatrist, Dr. Rosalyn Inniss, and a clinical psychologist, Dr. Kent Franks, in preparation for the hearing. Dr. Inniss and Dr. Franks stated opinions that claimant was preoccupied with his physical symptoms and the determination that he was "disabled." Both believed there was an issue of secondary gain with claimant in that he would no longer have to work if his symptoms persisted and he could be found

permanently and totally disabled. Dr. Inniss explained:

> Another level of secondary gain that he has experienced with his "illness" is that he presents himself as unable to work. His wife accepts that he cannot work because of his physical illness, not his psychological illnesses. Because of this, she works a full time job, balances the checkbook, cleans the house, cooks the meals etc. While he remains at home and does nothing. He will change his clothes multiple times a day but does not even do the laundry. He sees himself as never working again and sees no disparity with this as long as he can blame it on the trauma he suffered at the hands of his last employer. If he is declared disabled from his work and duly compensated he can fulfill his ambition to go fishing whenever he wants.
>
> . . .
>
> He attributes all of his psychological and physiological symptoms to his last employment which he views as being traumatic. Yet he was not prevented from leaving and specifically told this writer that he was advised to leave by others. He would lay responsibility for his social avoidance onto his workplace as well as the sequela from his work environment. Diagnostically, I cannot attribute [claimant's] current issues and symptoms to his employment. I would at best give [claimant] a diagnosis of Generalized Anxiety Disorder, which predated his employment with Litton with a rule out of Somatization Disorder. There are strong Axis II factors in his current present.

Dr. Franks also concluded that claimant suffered from Generalized Anxiety Disorder. He stated:

> Based upon the available information, in my opinion [claimant] suffers from a Generalized Anxiety Disorder. The subject's occupational stress contributed to this disorder. However, the persisting nature of this disorder cannot be solely attributable to job stress. The subject has a marked tendency to internalize anxiety and develop psychosomatic symptoms. There is a preexisting personality style which does not bode well for psychological treatment. Secondary gain issues and inconsistent symptom reports suggest that [claimant] has an alternative agenda. He plainly stated that he does not want to work for the rest of his life. He is not motivated to get well, and he probably will not recover until this case is resolved. Were the subject motivated he has the cognitive ability and the psychological resources to work in a different position which is more in keeping with his stress tolerance.

 There was conflicting medical testimony regarding whether claimant's disorder and symptoms were caused by his employment. "The decision to accept one of two conflicting medical opinions is an issue of fact for the Commission." *Johnson v. Denton Const. Co.,* 911 S.W.2d 286, 288 (Mo.banc 1995). *See also Birdsong v. Waste Management,* 147 S.W.3d 132, 140 (Mo.App.2004); *Chatmon v. St. Charles County Ambulance Dist.,* 55 S.W.3d 451, 457 (Mo.App.2001). The fact-finding body, here the commission, determines which medical opinions are the most credible. *Sherman v. First Financial Planners, Inc.,* 41 S.W.3d 633, 637 (Mo.App.2001). The commission's determination is one of credibility. It is binding on this court. *Id.*

 The fact that claimant suffered from generalized anxiety disorder and other stress-related symptoms does not require the award of compensation. "[P]roof of the condition is not proof of causation." *Duncan v. Springfield R–12 School Dist.,* 897 S.W.2d 108, 114 (Mo.App.1995).

There was sufficient evidence to support the commission's finding that claimant's work-related stress was not extraordinary or unusual when compared to other similar positions in his field and similar management positions with employer; that claimant failed to satisfy his burden of proving a work-related stress claim by objective standards and actual events. Point I is denied.

 Point II is directed to the administrative law judge's refusal to admit in evidence a job description survey, Exhibit TT, and opinions in that survey that compared claimant's duties to other employees that were represented as being similarly situated. Claimant contends the commission erred in concluding that the administrative law judge properly excluded Exhibit TT in that "the survey was reliable because it requested objective responses concerning job duties, and it was necessary to compare the job demands of employees in positions similar to that of [claimant]."

Claimant sought to introduce Exhibit TT as a means of meeting the requirements of § 287.120.8 that for work-related stress to be shown as arising out of and in the course of employment, it must be demonstrated "that the stress is work related and was extraordinary and unusual." Section 287.120.8 requires that the amount of work stress be measured by objective standards and actual events. As noted, *supra*, the proper means of demonstrating that mental injury was caused by work-related stress would be to compare claimant's work-related stress with that encountered by employees having similar positions. *Sherman*, 41 S.W.3d at 637; *Williams*, 996 S.W.2d at 628–29.

Exhibit TT is a description of a survey conducted on behalf of claimant and a summary of the results of the survey. The survey was represented as having been "conducted to determine the job responsi-

bilities and requirements of Environmental Managers in production plant/facilities that produce hazardous waste." It was conducted using open-ended verbal and written questions that allowed the person answering "to elaborate or expand on any job activities that they felt would need more clarification other than the listed or discussed description." Exhibit TT did not reveal the particular questions that were posed or the exact answers that were given.

Five companies were selected for interviews. They were identified "from public records within the state of Missouri as those listed who produced and registered as hazardous waste facilities." Claimant recommended the companies that were selected for the survey.

The first part of Exhibit TT is a letter written by Phillip Eldred, certified rehabilitation counselor. The letter stated the survey was performed by Eldred's son, Ross Eldred, an employment job developer. According to the letter, the survey involved companies the approximate size as Litton that had environmental safety positions; that the information included in the report was obtained from conversations with individuals at those companies with comparable responsibilities to those of claimant. The final page of Exhibit TT is a spreadsheet that summarized the survey results. Based on those results, Phillip Eldred concluded that claimant "endured an extraordinary and unusual degree of work stress."

Litton objected to Exhibit TT being admitted in evidence. The bases for its objection included that its results were hearsay; that no scientific basis was shown for selection of the employers who participated in the survey. Litton objected further as to the foundation for seeking admission of Exhibit TT; that the witness on whose

testimony the exhibit was being offered, Mr. Phillip Eldred, was not shown to have requisite training, experience, or background to testify concerning appropriate survey preparation methods. The objection further asserted that no basis was established for comparing the jobs of the survey participants, "what elements of the jobs that were concerned, what description of the job that was concerned, whether it was the description provided by [claimant] or the actual events as reflected in the trial and the issues to be determined by the judge." Litton contended that both the survey and the results of the survey were based on hearsay; that there was no foundation to support either. The administrative law judge took the objection under advisement at the time of the hearing and ultimately sustained the objection.

Courts have permitted scientifically designed and statistically reliable surveys to be used in evidence. *See, e.g., Del–Mar Redevelopment Corp. v. Associated Garages, Inc.*, 726 S.W.2d 866 (Mo.App.1987), and *Liberty Financial Management Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40 (Mo.App.1984). In *Liberty* the survey was scientifically designed by a mathematician-statistician with extensive experience in conducting surveys. The survey group was selected using the random number table, an accepted method for selecting representative groups. Neither the interviewers nor those interviewed knew the purpose of the survey.

In *Del–Mar* the survey was a formula an expert utilized in arriving at a value of property that had been taken by condemnation. An expert witness for the property owner was a partner and chief executive officer of one of the three largest car wash equipment manufacturers in the United States. The property being condemned was a self-service car wash. The witness had developed a formula for assessing the

desirability of potential car wash sites. It had evolved from interviews with approximately 500 self-service car wash owners nationwide. The formula was incorporated in a self-serve car wash trade paper the witness published. It was used at trial to assess the desirability of the property being condemned for the use to which it was put. With the aid of the newsletter formula, the witness arrived at a value for the property. On appeal, the use of the data on which the formula was based was challenged as having been based on hearsay in that it was derived from information obtained from various self-serve car wash owners.

*Del–Mar* held it was not error to permit the witness to use the newspaper-survey formula as a basis for his testimony. The court explained:

Obviously, the newsletter-survey here was based on hearsay information from various self-serve carwash [sic] owners. Not all of this information was acquired directly by [the expert witness]. But, [the witness] used this newsletter-survey merely as a basis for explaining his opinion of [the property owner's] property; he did not use it as independent substantive evidence of value. Even the document itself states that it is to be used only as a guide. The survey may not have been scientifically designed, *cf. Liberty Financial Management Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40, 55 (Mo.App.1984), but it did have aspects of trustworthiness to justify its use by [the witness] in formulating his opinion. *See Pittsburgh Press Club v. United States*, 579 F.2d 751, 757–758 (3d Cir.1978). The survey was not designed for use in litigation, but was designed to aid [the witness] in his business. Those answering the questionnaire had no reason to lie; they could not profit from the answers.

They were merely giving specific information based on their own experiences owning and operating self-service carwashes [sic]. It was actually to their benefit to give the most truthful answers possible knowing that they would possibly have a written aid in assessing future sites. And, after compiling the data, [the witness] attempted to verify the results with still other carwash owners. Under these circumstances, we conclude [the witness] could testify using the newsletter-survey to explain the basis of his opinion since the information used to formulate the survey itself was not offered in evidence. *See [State ex rel. State Highway Commission v.] Carlson,* [463 S.W.2d 74, 78 (Mo.App. 1970) ].

726 S.W.2d at 871–72.

Here, the survey that was sought to be introduced in evidence and used as a basis for testimony consisted of the letter written by Phillip Eldred identifying what had been conducted as "[a] job description survey." It included references to a list of questions that had been used, but recited only the nature of the questions, not the questions themselves. It characterized the list as "cover[ing] all major aspects of an environmental manager's job." It then listed categories of topics it represented as having been covered in the questioning. That was followed by a page that identified five companies that "filled out the job description survey," and the individual in each company who responded for the company. (The survey itself was not tendered in evidence.) This page was followed by "results" that had been transferred into a spreadsheet. The spreadsheet listed 13 job duties of what was characterized as "Duties of Environmental Managers in the State of Missouri." Six columns appeared to the right of the list of job duties in which "x's" could be placed under the name of the five companies contacted and a sixth column in which claimant's duties could be marked.

Here, as in *Dummit v. Burlington Northern Railroad Co.,* 789 S.W.2d 136 (Mo.App.1990), the survey in question was taken solely for the purpose of litigation. The precise questions that were posed were not identified, nor were the exact answers disclosed at the hearing. Arguably, by accepting claimant's recommendations as to what companies to include in the survey, the selection of those responding could be characterized, as in *Dummit,* as having been done haphazardly. *Dummit* suggested that the only indicium of trustworthiness of the survey in that case "was the survey taker's conclusion that the results were trustworthy." *Id.* at 138. That suggestion appears apropos with respect to the survey that is the subject of Point II.

"Admission of evidence and making a determination regarding whether a good and sufficient foundation was laid for that evidence is within the Commission's sound discretion." *Werber v. Washington University,* 998 S.W.2d 877 (Mo.App.1999). This court finds no abuse by the commission in its adoption of the administrative law judge's ruling that Exhibit TT was not admissible and could not be utilized as a basis for testimony. Point II is denied. The Final Award Denying Compensation is affirmed.

LYNCH, C.J., and BURRELL, P.J., concur.