

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| CITY OF CLINTON, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | WD85780 |
| | ) | |
| ROBERT DAHMAN, | ) | Filed: May 30, 2023 |
| | ) | |
| Respondent. | ) | |

**Appeal from the Labor and Industrial Relations Commission**

**Before Division Two: Alok Ahuja, P.J., and
Anthony Rex Gabbert and Thomas N. Chapman, JJ.**

Robert Dahman previously worked as a police officer for the City of Clinton. While on duty in August 2017, Dahman responded to an active crime scene after another officer was fatally shot. Dahman was diagnosed with post-traumatic stress disorder following the incident, and resigned from the police force a short time later. He filed a claim for workers' compensation benefits. The Labor and Industrial Relations Commission awarded him benefits for his post-traumatic stress disorder. It found that Dahman had suffered a permanent partial disability of 10% of the body as a whole. The City appeals. It contends that Dahman failed to show that the work-related stress causing his post-traumatic stress disorder was "extraordinary and unusual," as required by

§ 287.120.8.[1]  We affirm the Commission's award of workers' compensation benefits.

## Factual Background

Robert Dahman began working for the City of Clinton's Police Department in January 2011. The evidence indicated that Clinton's police force was small, and close-knit. Dahman underwent and passed psychological evaluations before being hired.

Dahman worked as a patrol officer, and frequently made traffic stops and issued traffic citations. Dahman testified that during his time on the force, he responded to hundreds of domestic violence calls, and secured hundreds of crime scenes. Dahman testified that he never discharged his firearm while on duty.

On the night of August 6, 2017, Dahman was working an overnight shift from 9:00 p.m. until 7:00 a.m. Officer Gary Michael was also on patrol that night. Officer Michael was a good friend of Dahman's, and they spent time together outside of work. At approximately 10:30 p.m., Dahman heard Officer Michael report over the radio that he had made a traffic stop; shortly thereafter, Officer Michael reported, "Shots fired. Officer hit." Dahman responded to the scene. On his way, he heard over his radio that the suspect vehicle had fled. When he arrived at the scene of the shooting, Dahman found Officer Michael unconscious on the ground. Officer Patrick Meeks was also on the scene, attempting to administer first aid to Officer Michael. At the time, the officers did not know how many suspects were involved. Dahman testified that he was in shock after learning that Officer Michael had been shot.

---

[1] Unless otherwise indicated, statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2022 Cumulative Supplement.

Dahman was told by a 9-1-1 dispatcher that the suspect's vehicle had crashed after fleeing the shooting scene. Dahman responded to the crash site. The area was dark, with very little lighting from nearby homes or streetlights. Dahman found no sign of the suspect, or of a weapon, in or near the vehicle. Shortly after arriving at the crash site, Dahman learned that the suspect had used a high-powered rifle to shoot Officer Michael. Dahman feared for his safety because he was wearing similar protective gear to Officer Michael, and he knew that his bulletproof vest would not stop rounds from a high-powered rifle. Dahman was also concerned that, having already shot one police officer, the suspect might have little hesitation in shooting another, thinking "he has nothing to lose at this point." Dahman was alone at the crash site for approximately thirty minutes, and was there most of the night and into the morning of August 7. In the dark at the crash scene, with a potentially armed suspect still at large, Dahman testified that he felt "very vulnerable." Dahman knew that he "was clearly out gunned with just a pistol," that he "was well within [the suspect's] rifle range," and that the suspect "had the darkness that he could hide in." During the time he was alone at the scene, Dahman was "[h]iding behind [his] patrol car," to take cover from possible gunfire.

While at the site of the suspect's vehicle, Dahman learned that Officer Michael had died from his injuries. Dahman was upset and emotional upon hearing this news.

Before he finished work in the morning, Dahman watched security-camera video footage from a gas station, which showed Officer Michael conducting the traffic stop of the suspect's vehicle.

Officer Michael's funeral was attended by police officers from all over the United States, and included a funeral procession through Clinton. Dahman was one of Officer Michael's pallbearers.

The manhunt for the suspect took several days. News media came to the City to cover the event. After the suspect was apprehended, Dahman was scheduled to be a witness at his trial.

Starting immediately after the August 2017 incident, Dahman began to experience adverse symptoms including fatigue, anxiety, tightness in the chest, insomnia, lack of motivation, and a sense of helplessness. He was easily startled, experienced crying spells and nightmares, and would avoid conversations about the incident. He also substantially increased his consumption of alcohol. Before the August 2017 incident, Dahman had experienced other traumatic events such as responding to the death of an infant in the line of duty. Dahman testified, however, that he had not experienced mental-health issues prior to Officer Michael's shooting.

Dahman resigned from the Police Department in October 2017. He testified that the events surrounding Officer Michael's shooting were the primary factor causing him to leave the police force and to seek other, non-law-enforcement-related employment, since Dahman felt that he could not do his job due to his fear of being shot. Dahman also testified that he believed his subsequent divorce was attributable at least in part to his mental-health issues and increased alcohol consumption arising from the August 2017 events.

Clinton's Chief of Police at the time was Kevin Miller. Chief Miller had served in that capacity for thirteen years at the time of his deposition in 2018.

4

Chief Miller testified that Officer Michael's shooting was the first officer shooting during his time with the Department; this was the first line-of-duty fatality in Clinton that either Chief Miller or Dahman could recall. Chief Miller testified that Officer Michael's shooting was "an unusual . . . [and] extraordinary event for the City of Clinton Police Department." Indeed, in his deposition, Chief Miller agreed with the City's counsel that it was "[e]xtraordinarily unusual for a police officer to be shot" anywhere in the United States – not just in Clinton.

Chief Miller testified that he spoke with Dahman about the shooting. He testified that both he and Dahman were "struggling," and provided "support for each other and what we were going through." Dahman reported to Chief Miller that he was experiencing "a lot of anxiety," "was having nightmares" and "trouble sleeping," and "was using alcohol a great deal more than what he normally did." Chief Miller testified that other officers in the Department were experiencing similar issues. During Chief Miller's deposition, he had to take a break because he was overcome by emotion while recounting the events surrounding Officer Michael's shooting.

The City brought in a counselor and crisis team to speak to the police officers. Chief Miller testified that he requested that the counselor speak to his officers based on his concerns over "the mental well-being of the officers involved and the department as a whole." Chief Miller testified that he asked the City to provide additional resources for the Police Department's officers following the shooting, including additional therapy sessions with the counselor retained by the Department. In addition, "[t]he city started an employee assistance program that affords them meetings and therapy with mental health people."

5

In addition to the mental-health services provided by the City, Dahman also sought help from his primary care physician, who prescribed medications to treat his symptoms. Dahman later discontinued taking one of the medications after his anxiety improved, but his physician increased the dosage of citalopram (known by the brand name Celexa), an anti-depressant which Dahman continues to take.

Dahman filed a claim for workers' compensation benefits. At the request of his counsel, Dahman was examined by Dr. Dale Halfaker, a psychologist, in July 2018. Dr. Halfaker had examined police officers involved in line-of-duty shootings before, and had been retained by the City of Springfield in the past to determine whether its police officers had suffered compensable mental-health-related injuries. Dr. Halfaker diagnosed Dahman with Post-Traumatic Stress Disorder ("PTSD") arising primarily from the August 2017 incident. Dr. Halfaker rated Dahman with a disability of 10-14% to the body as a whole. Dr. Halfaker also opined that the August 2017 event was extraordinarily and unusually stressful. The Commission's award noted that, in concluding that the stress experienced by Dahman was extraordinary and unusual, Dr. Halfaker had relied on "objective standards," including the following circumstances: "that [Dahman] was in the dark, lit up standing by the car knowing that the person had a rifle, knowing that the suspect had already killed one police officer so why would he have second thoughts about perhaps killing another." Dr. Halfaker opined that it was not surprising that a police officer would react as Dahman has to the type of event he experienced. Dr. Halfaker advised Dahman not to return to law enforcement work.

The City referred Dahman to Dr. William Logan for a psychiatric examination in February 2019. Like Dr. Halfaker, Dr. Logan diagnosed Dahman with PTSD, and opined that the events surrounding Office Michael's shooting were the prevailing factor in causing the disorder. Dr. Logan opined that the August 2017 incident rose to the level of an extraordinary and unusual mental stress based on the fact that it was the first line-of-duty officer fatality experienced in Clinton; the Department was small and close-knit; and Dahman in particular had been exposed to potential attack, and feared for his life. Dr. Logan stated that if no treatment was provided, he would rate Dahman with a permanent partial disability of 10% of the body as a whole stemming from the August 2017 incident.

Following Dr. Logan's retirement from practice, the City had Dahman examined by another psychiatrist, Dr. Sheba Khalid. Due to Covid-19 restrictions Dr. Khalid saw Dahman by videoconference in June 2020; she spoke to him again by telephone in June 2021. After interviewing Dahman, reviewing his records, and conducting a mental status examination, Dr. Khalid diagnosed Dahman with PTSD. She noted that Dahman had responded well to treatment but still had some residual symptoms. Dr. Khalid agreed that the prevailing factor causing Dahman's PTSD was the August 2017 incident, and that the stress he experienced in connection with that incident was extraordinary and unusual. In light of the improvement in Dahman's condition by the time of their June 2021 conversation, Dr. Khalid concluded that Dahman did not have a permanent partial disability associated with his PTSD, and was not in need of further psychiatric treatment for that condition.

The City called City Administrator Christy Maggi to testify at trial. Maggi testified that she was not aware of any other workers' compensation claims filed against the City related to the August 2017 event.

On March 14, 2022, the Administrative Law Judge ("ALJ") issued a Final Award finding that Dahman's Post-Traumatic Stress Disorder was a compensable occupational disease caused by the August 2017 incident. The ALJ found that Dahman had suffered a permanent disability of 10% to the body as a whole. The ALJ's Award specifically found that "Dahman showed by objective standards that his work-related stress was both extraordinary and unusual and meets the requirements of" § 287.120.8.

> Despite the contention of the City [ ] that police officers' shootings are not extraordinary, the Court declines to accept the City['s] reasoning. The particular facts of [Dahman's] experiences, including but not limited to, responding to the scene of Officer's Michael's shooting wh[o] was a friend of Officer Dahman, knowing that the suspect was still at large, knowing that the suspect had a long rifle, knowing that the protective vest would not help if the suspect decided to shot [sic] again, and feeling like a sitting duck in the dark are all factors in support of the award of compensation . . . .

The City applied for review by the Labor and Industrial Relations Commission. The Commission issued its Final Award Allowing Compensation on September 30, 2022. The Commission found that the ALJ's decision was supported by competent and substantial evidence, and incorporated the ALJ's award into its ruling.

The City appeals.

8

## Discussion

The sole issue on appeal is whether substantial evidence supports the Commission's finding that Dahman's work-related stress was "extraordinary and unusual" as measured by objective standards.

On appeal of a final award by the Labor and Industrial Relations Commission, this Court

> shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the award was procured by fraud;
>
> (3) That the facts found by the commission do not support the award;
>
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

§ 287.495.1.

"Sufficient competent evidence is evidence which has probative force on the issues and from which the trier of facts can reasonably decide the case." *Hayden v. Cut-Zaven, Ltd.*, 614 S.W.3d 44, 54 (Mo. App. E.D. 2020) (quoting *Harris v. Ralls Cnty.*, 588 S.W.3d 579, 597 (Mo. App. E.D. 2019)). We review the evidence "in the context of the whole record" rather than in the light most favorable to the award. *Harris*, 588 S.W.3d at 594. However, we defer to the Commission's determinations as to the credibility of witnesses and the weight given to conflicting evidence; unless there is evidence of fraud, the Commission's factual findings are conclusive. *Dubuc v. Treasurer of State*, 659 S.W.3d 596, 601 (Mo. 2023). An award is not supported by sufficient competent evidence "'in

the rare case when [it] is contrary to the overwhelming weight of the evidence.'" *Jackson Cnty. v. Earnest*, 540 SW.3d 464, 469 (Mo. App. W.D. 2018) (quoting *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. 2003)).

Section 287.120.8 provides:

> Mental injury resulting from work-related stress does not arise out of and in the course of the employment, unless it is demonstrated that the stress is work related and was extraordinary and unusual. The amount of work stress shall be measured by objective standards and actual events.

The Missouri Supreme Court has explained that the "objective standard" required by § 287.120.8 is "'[a] legal standard that is based on conduct and perceptions external to a particular person.'" *Mantia v. Mo. Dep't of Transp.*, 529 S.W.3d 804, 809 (Mo. 2017) (citation omitted). Accordingly, to establish a compensable mental injury under § 287.120.8, an employee must show that the events they experienced would cause a reasonable person in the same profession extraordinary and unusual stress. *Id.* at 810. In making this assessment, "individualized, subjective reactions to [the] circumstances are irrelevant." *Id.*

A claimant may satisfy § 287.120.8 in multiple ways. *Id.* One approach is to compare the employee's level of work-related stress with others in similar positions. *Id.* (citing *Schaffer v. Litton Interconnect Tech.*, 274 S.W.3d 597, 601 (Mo. App. S.D. 2009); *Carnal v. Pride Cleaners*, 138 S.W.3d 155, 158 (Mo. App. W.D. 2004)). This may include consideration of the stress encountered by similarly situated workers employed by the same employer, as well as the stress experienced by employees in similar positions who work for other employers. *Schaffer*, 274 S.W.3d at 601-03; *Williams v. DePaul Health Ctr.*, 996 S.W.2d 619,

10

628 (Mo. App. E.D. 1999) (overruled on other grounds by *Hampton*, 121 S.W.3d 220).

Where a claimant fails to present evidence that the stress they experienced was unusual compared to other similarly situated workers, compensation is properly denied for mental-health conditions. Thus, in *Schaffer*, the Court affirmed the Commission's finding that an environmental engineer who developed general anxiety disorder and related issues did not demonstrate that his stress was extraordinary and unusual, where his testimony reflected that all of the conditions that caused his stress were shared by other employees at the same managerial level. 274 S.W.3d at 601-03. The Court also noted that the claimant had failed to prove that the level of stress he experienced was greater than others in comparable positions in the industry, when he testified that he was unable to find a less stressful job within his field, and that all the jobs he applied for required 60-70 working hours per week. *Id.* at 603.

Similarly, in *Williams*, the evidence was insufficient to support a finding of extraordinary and unusual mental stress where the employee only testified to her own experience, but did not offer any evidence that she experienced greater stress than hematologists working for her lab or for other similar labs. 996 S.W.2d at 628.

On the other hand, where an employee introduces evidence that they were subject to unique workplace stressors, an award of compensation is justified. For example, in *Carnal*, 138 S.W.3d 155, we affirmed an award of compensation for mental injury. The evidence indicated that the claimant "was faced with unique circumstances that were not shared by her fellow plant managers" following a

11

corporation reorganization. *Id.* at 158. The evidence established that the claimant worked in a particularly "dilapidated" facility with poor ventilation and older equipment, which was prone to breakdowns and had lower production capacity. *Id.* at 159. The deteriorated physical plant "contributed to employee morale problems and a higher turnover rate compared to other facilities." *Id.* In addition, the claimant "faced a unique situation as compared to [the employer's] other production plant managers, in that her supervisor was her ex-husband," and "there was a great deal of animosity in the[ir] working relationship." *Id.*

In this case, Dahman introduced substantial evidence that his experiences in the August 2017 incident were extraordinarily and unusually stressful by objective standards. While the record reflects that police officers may frequently encounter dangerous situations, Officer Michael's murder was apparently the first officer-related fatality ever experienced in the City of Clinton. Dahman was close friends with Officer Michael, and played a prominent role in his funeral. In addition, Dahman was exposed to a life-threatening and extremely stressful situation when he was required to secure the scene where the suspect's vehicle had crashed. At least for a period of time, Dahman secured the scene by himself and in the dark, while the suspect remained at large, armed with a high-powered rifle to which Dahman was effectively defenseless. These were circumstances to which none of his colleagues were exposed, even if they were otherwise involved in the response to, and investigation of, Officer Michael's shooting.

The fact that Officer Michael's shooting created extraordinary and unusual stress is confirmed by the City's actions in the shooting's aftermath: retaining a counselor for the officers involved; bringing in a crisis response team; and

instituting an employee assistance program to assist with mental-health issues. The City's out-of-the-ordinary responses to the shooting belie its claim that what Dahman experienced was just a run-of-the-mill part of his job.

Three mental-health experts, and the City's Chief of Police, uniformly testified that the circumstances to which Dahman was exposed in August 2017 were extraordinary and unusual. In fact, in response to questioning by the City's counsel, Clinton's Chief of Police agreed that it was "extraordinarily unusual" to have a shooting of a police officer anywhere in the United States – not simply in Clinton. The testimony of Chief Miller and the mental health professionals – all received without objection – constitutes competent and substantial evidence supporting the Commission's award. *See*, *e.g.*, *State ex rel. GS Techs. Op. Co. v. Pub. Serv. Comm'n*, 116 S.W.3d 680, 690 (Mo. App. W.D. 2003) ("'all probative evidence received without objection in a contested case must be considered in administrative hearings'" (citation omitted)). Although the City's briefing repeatedly asserts that Dahman's case focused on his personal, subjective experience, and that he offered no testimony "as to the circumstances that are experienced as part of the job in general," that is simply untrue – Dahman's witnesses testified without objection that his experiences were extraordinary and unusual in the context of the typical work of a local police patrol officer.

While the City is correct that Dr. Halfaker was not a physician and could not prescribe medication, it did not object to the competency of his opinion testimony when it was offered. In any event, in workers' compensation cases "[a] medical expert need not be a medical doctor, or physician." *Hogenmiller v. Mississippi Lime Co.*, 574 S.W.3d 333, 337 (Mo. App. E.D. 2019) (citation

13

omitted). They must only possess a "peculiar knowledge, wisdom or skill regarding the subject of inquiry, acquired by study, investigation, observation, practice or experience." *Id.* (citations and internal quotation marks omitted). Dr. Halfaker has a Ph.D. in psychology, and testified to having particular experience working with police officers involved in work-related shootings. He had been retained by the City of Springfield to determine whether its officers had compensable mental-health-related injuries. Dr. Halfaker's opinion that the events Dahman experienced were extraordinary and unusual was competent and substantial evidence supporting the Commission's Final Award.

The City's briefing also emphasizes that no other officers asserted claims for workers' compensation benefits based on the events in August 2017. Chief Miller testified, however, that other officers – including Chief Miller himself – experienced significant emotional struggles following the event, even if they chose not to seek workers' compensation benefits as a result. Moreover, the evidence indicated that Dahman was particularly close to Officer Michael, and that Dahman was the only one to be alone, in a highly vulnerable position, at the crash site. Finally, to establish his right to compensation, Dahman "need not show the subjective experiences of [his] fellow workers were not as severe as [his] experiences, but rather, [he] must demonstrate the actual events [he] experienced were such that a reasonable [police officer] would experience extraordinary and unusual stress." *Mantia*, 529 S.W.3d at 810. While the Commission could consider the lack of other workers' compensation claims arising from the August 2017 incident, the absence of other claims did not

prevent the Commission from finding that Dahman was subject to extraordinary and unusual stress during that incident.

The City also emphasizes Dr. Halfaker's testimony that "police officers frequently encounter situations every day where there is some threat to their safety," and that "the securing of a crime scene occurs on a regular basis." While Dr. Halfaker may have generally testified that some measure of danger, and exposure to crime scenes, is common in police work, he also testified that *the particular stresses* to which Dahman was exposed in August 2017 were extraordinary and unusual. Truisms like "police work is dangerous" and "police officers frequently respond to crime scenes" do not address the inquiry required by § 287.120.8: whether "*the actual events [Dahman] experienced* were such that a reasonable [police officer] would experience extraordinary and unusual stress." *Mantia*, 529 S.W.3d at 810 (emphasis added).

## Conclusion

Sufficient competent evidence supported the Commission's conclusion that Dahman's Post-Traumatic Stress Disorder was caused by work-related stress which was extraordinary and unusual, measured by objective standards and actual events. The Commission's Final Award Allowing Compensation is affirmed.

_____
Alok Ahuja, Judge

All concur.

15